# EXHIBIT A

**VIRGINIA:**

## IN THE CIRCUIT COURT FOR THE COUNTY OF MONTGOMERY

| | |
|---|---|
| **DR. MARK E. VAN DYKE** | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| **WAKE FOREST UNIVERSITY** | ) |
| **HEALTH SCIENCES** | ) |
| | ) |
| Serve: J. Reid Morgan | ) |
| Wake Forest University | ) |
| Medical Center Boulevard | ) |
| Winston Salem, NC 27157 | ) |
| | ) |
| **KERANETICS, LLC** | )     Case No. _____ |
| | ) |
| Serve: Capitol Services, Inc. | ) |
| 1675 S. State St. Suite B | ) |
| Dover, DE 19901 | ) |
| | ) |
| **VIRTUE LABS, LLC** | ) |
| | ) |
| Serve: Melisse Shaban | ) |
| Registered Agent | ) |
| 19 W. Hargett Street, Suite 501 | ) |
| Raleigh, NC 27601 | ) |
| | ) |
| **LUKE BURNETT** | ) |
| | ) |
| Serve: 3526 North Lakeshore Drive | ) |
| Clemmons, NC 27012 | ) |
| | ) |
| **KIM WESTMORELAND** | ) |
| | ) |
| Serve: 4240 Allistair Road | ) |
| Winston Salem, NC 27104 | ) |
| | ) |
| **CHARLES W. "TODD" JOHNSON** | ) |
| | ) |
| Serve: 7429 Morrocroft Farm Lane | ) |
| Charlotte, NC 28211 | ) |
| | ) |
| Defendants. | ) |

THE CREEKMORE
LAW FIRM PC

{00184410 1 }

<u>COMPLAINT</u>

Dr. Mark E. Van Dyke brings this Complaint for breaches of contract and fiduciary duties, misappropriation of trade secrets, conversion, unjust enrichment, and business conspiracy, stating as follows:

<u>PARTIES</u>

1. Plaintiff Dr. Mark E. Van Dyke, PhD, is an individual residing in the County of Montgomery, Virginia, who is an Associate Professor of Biomedical Engineering at Virginia Polytechnic Institute and State University ("Virginia Tech") in Blacksburg, Virginia.

2. Defendant Wake Forest University Health Sciences ("WFU") is a private non-profit medical research and clinical health services organization with its principal place of business in Winston Salem, North Carolina.

3. Defendant KeraNetics, LLC ("KeraNetics") is a Delaware limited liability company with its principal place of business in Winston Salem, North Carolina.

4. Defendant Virtue Labs, LLC ("Virtue Labs") is a Delaware limited liability company with its principal place of business in Raleigh, North Carolina.

5. Defendant Luke Burnett ("Burnett") is a natural person, citizen and resident of North Carolina, who has acted at various times for and on behalf of KeraNetics, Virtue Labs and/or in or for his individual, personal interests.

6. Defendant Kim Westmoreland ("Westmoreland") is a natural person, citizen and resident of North Carolina, who has acted at various times for and on behalf of KeraNetics, Virtue Labs and/or in or for his individual, personal interests.

THE CREEKMORE
LAW FIRM PC

7.  Defendant Charles W. "Todd" Johnson ("Johnson") is a natural person, citizen and resident of North Carolina, who has acted at various times for and on behalf of KeraNetics, Virtue Labs and/or in or for his individual, personal interests.

<u>JURISDICTION AND VENUE</u>

8.  This court has jurisdiction over this dispute pursuant to Va. Code Ann. §§ 8.01-184, -328.1, and -328.3, and 17.1-513.

9.  Venue is proper in this Court pursuant to Va. Code Ann. §§ 8.01-262(4).

<u>FACTS</u>

10.     Dr. Van Dyke is one of the world's leading researchers in the field of keratins, the proteins that make up wool, hair and fingernails.  Dr. Van Dyke has been performing research on keratin for more than twenty years. In that time, Dr. Van Dyke has acquired and/or developed extensive knowledge, information, know-how, trade secrets and other intellectual property related to the production and manufacture of keratins and keratin biomaterials; the development of products made from keratins and keratin biomaterials; and their applications in numerous markets, particularly healthcare, personal care products and cosmetics.

11.     Dr. Van Dyke is the sole or primary inventor on thirty-eight granted United States patents and twenty-four United States patents pending, as well as more than eighty international patents and patents pending, most in the field of keratin research and development.  He has published more than eighty papers in peer-reviewed scientific journals, has published four book chapters, and edited four books, most in the field of keratin research and development.  He has graduated more than ten PhD students in keratin-related studies.

12.     In 2004, after more than six years performing research on keratins and keratin-based biomaterials at Southwest Research Institute in San Antonio, Texas, Dr. Van Dyke

THE CREEKMORE
LAW FIRM PC

moved his keratin biomaterials research program to the Wake Forest University School of Medicine in Winston Salem, North Carolina, a part of Wake Forest University Health Sciences (collectively, these entities are referred to herein as "WFU"). **Exhibit 1**. There he joined the faculty as a founding member of the Wake Forest Institute for Regenerative Medicine.

13.     With his offer letter, Dr. Van Dyke was presented with a WFU Organization and Policies Handbook ("Handbook"), which described the duties and obligations of WFU and Dr. Van Dyke to each other.  **Exhibit 2**.

14.     The Handbook includes an "Inventions and Patent Policy" (**Exhibit 2** at IV-62) that identifies the undertaking by WFU as being designed to reward the developers of inventions (**Exhibit 2** at IV-62, Section 1.a), with specific mention of WFU's sale and licensing of inventions being designed to provide "maximum return to the University and the inventors." (**Exhibit 2** at IV-64, Section 3.d.(3).)  The Handbook further provides, in exchange for this undertaking, that all "Inventions," (*Id.* at ¶2) developed by faculty within the faculty's normal field of employment become "the property of the University." **Exhibit 2** at IV-64-65, ¶4.

15.     Prior to Dr. Van Dyke's employment by WFU, WFU did not engage in, nor did it employ any individual that had prior experience in, keratin biomaterials.  As of Dr. Van Dyke's employment, WFU did not have prior or existing keratin-based inventions, know-how, trade secrets or intellectual property – including patents or license agreements.

16.     During Dr. Van Dyke's tenure at WFU from 2004 through 2012, he was the only scientist or faculty member at WFU with expertise in keratins and keratin biomaterials. He was responsible, in whole or in substantial part, for all keratin-related inventions, know-how, trade secrets and intellectual property that was developed at WFU while he was there.  In

THE CREEKMORE
LAW FIRM PC

the time since Dr. Van Dyke's departure, WFU has not employed individuals with similar expertise or know-how in keratin biomaterials as Dr. Van Dyke.

17.     During his tenure with WFU, Dr. Van Dyke disclosed more than a dozen inventions to the Office of Technology Asset Management ("OTAM"), pursuant to the terms of his employment with WFU, and in keeping with the Handbook's Inventions and Patent Policy. WFU filed United States and international patent applications with respect to many of Dr. Van Dyke's inventions, while others deemed unpatentable still were regarded as valuable intellectual property and "Inventions" owned and managed by WFU as part of the portfolio of work disclosed to and considered retained by WFU.

18.     Dr. Van Dyke assigned his rights in all of these inventions to WFU as a condition of his employment by WFU and in accordance with the Handbook's Inventions and Patent Policy" (**Exhibit 2** at IV-62).  An example of one of many Assignments entered into by Dr. Van Dyke is attached as **Exhibit 3**.  WFU maintains the fully executed copies of each Assignment entered into by Dr. Van Dyke.

19.     As additional consideration for the assignment of all inventions by faculty such as Dr. Van Dyke to WFU, the Handbook provides for a division of all revenues and royalties derived therefrom between WFU and the inventor. **Exhibit 2** at IV-66. Dr. Van Dyke's specific share of that division of revenues resulting from each and every one of his inventions and assignments is 40%. **Exhibit 4**.

20.     Dr. Van Dyke's ongoing body of research and development work has generated considerable work product consisting of general keratin-related knowledge, information, experience, expertise, intellectual property, know-how and trade secrets, not all of which has been disclosed in invention disclosures, patent applications, licenses or other public

THE CREEKMORE
LAW FIRM PC

documentation. Much of this ever-developing body of "Keratin Know-How" may be considered jointly owned by Dr. Van Dyke and any university employer of Dr. Van Dyke at the time of its development and may travel with Dr. Van Dyke for future expansion, use, research, development and studies, even after leaving the employ of any particular university. This is certainly true of the Keratin Know-How Dr. Van Dyke brought to WFU and continued to develop while there.

21. Included within Dr. Van Dyke's keratin-based body of research and development work are physical copies of more than 100 papers, patents, abstracts, book chapters and other documents and materials, as well as an assemblage of more than 2,000 additional references to other closely related scholarly literature and publications, plus many translations of works in languages other than English, all relating specifically to the science of keratin and keratin biomaterials. This "Keratin Library" has been created, generated, collected or assembled by Dr. Van Dyke or others acting under his direction in the course of his keratin studies, research and development work over two decades. The value in the Keratin Library is not derived merely from its volume but additionally, if not more so, from the specific assemblage and collection of relevant and necessary works of critical importance to further keratin-based research and development. To Dr. Van Dyke's knowledge, no other collection of keratin-related literature of its type, extent or quality exists anywhere in the world.

22. As with the Keratin Know-How, this ever-developing Keratin Library similarly may be considered jointly owned by Dr. Van Dyke and any of his university employers at the time of its development. The Keratin Library in fact has remained with Dr. Van Dyke for his continued expansion, use, research, development and studies as he has moved from one university employer to the next.

THE CREEKMORE
LAW FIRM PC

{00184410 1 }

6

23.     Dr. Van Dyke is extremely reliant on his extensive Keratin Know-How and the Keratin Library to continue his laboratory research and attract grant funding for the same. The Keratin Know-How and Keratin Library also jointly provide an essential platform for new research, which can lead to the development of new innovations and intellectual property that could become the basis of future patentable inventions. These new innovations and inventions can be commercialized through various mechanisms such as licensing to companies, co-development, or forming startup companies.

24.     Mismanagement, loss, misappropriation or unprotected public disclosure of the Keratin Know-How and/or Keratin Library could cause Dr. Van Dyke to personally suffer considerable injury, damage and future losses and threaten the continuation of his keratin-based research and development, his opportunities for grant-funding and sponsored research, and the prospects for commercial and financial success through successful new innovations and inventions in keratin-related products.

25.     In 2008, after more than a decade of intense study of keratins and keratin-based biomaterials, Dr. Van Dyke co-founded KeraNetics, LLC to further develop and commercialize his inventions. Inasmuch as Dr. Van Dyke was then employed at WFU, WFU was integrally involved in and knowledgeable of Dr. Van Dyke's steps to establish KeraNetics. In fact, with OTAM's input, Dr. Van Dyke selected Kim Westmoreland, an MBA recipient and local entrepreneur, as KeraNetics' founding Chief Executive Officer. Westmoreland in turn selected Charles Johnson, another MBA recipient who had previously worked with Westmoreland, to serve as Managing Director of KeraNetics.

THE CREEKMORE
LAW FIRM PC

26.     Dr. Van Dyke became the Chief Scientific Officer of KeraNetics and was a member of KeraNetics' Board of Directors and a Manager of the Company.  At KeraNetics' founding, Dr. Van Dyke was KeraNetics' largest equity holder.

27.     As its contribution to the establishment of KeraNetics, WFU granted KeraNetics a substantial license (the "License") to keratin resources, including an exclusive, worldwide license to the Patent Rights in a large number of United States and international patent applications listing Dr. Van Dyke as the sole inventor, as well as a non-exclusive, worldwide license to the Keratin Know-How and other related intellectual property and improvements. The License also gave KeraNetics access to, and a copy of, the Keratin Library – the only copy in existence other than that possessed by Dr. Van Dyke. See **Exhibit 5**.

28.     The License was essential to the formation and future success of KeraNetics. Without it, the company had no other comparable source of keratin expertise and Know-How. The License gave KeraNetics a tremendous competitive advantage as it represented a decade of intensive keratin research conducted by Dr. Van Dyke, funded by millions of dollars of grants that had been secured by Dr. Van Dyke. KeraNetics relied on the licensed keratin technology to attract investments, submit grant funding applications and win awards, hire and train new employees, design and implement in-house manufacturing of keratin, manage its product development program, pursue regulatory approval for its products, and otherwise execute the company's overall business plan.

29.     In exchange, KeraNetics agreed to terms requiring it to use the licensed Keratin Know-How appropriately and restrictively, to protect it from misuse and public disclosure, and to actually develop and commercialize it to provide maximum return to both WFU and Dr. Van Dyke. To this end, Section 5 of the License imposed time limits on KeraNetics to reach specific

THE CREEKMORE
LAW FIRM PC

{00184410 1 }

8

fundraising goals, build a manufacturing facility, begin clinical trials, make its first commercial sales, and reach annual net sales of the products it was developing under the License.

30.     The License also imposed on KeraNetics a financial obligation to make "Milestone Payments" for the first five products achieving "Milestone Events," expressly recognizing that such payments were due "whether the Milestone Event is achieved by KeraNetics <u>or its Affiliates</u> and without regard to the Therapeutic Subfield in which the Products fall." (**Exhibit 5**, § 3.9) (emphasis added).

31.     The License also laid out a formula for other payments (the "Royalty Payments") by KeraNetics to WFU based on Product sales achieved under the License or sublicenses thereof. (See **Exhibit 5**, §§ 3.10-3.12.)

32.     The License obligated KeraNetics to use part of its operating funds to support research in Dr. Van Dyke's laboratory at WFU under a Sponsored Research Agreement ("SRA"). (**Exhibit 5**, § 3.10.)  Because KeraNetics' principals, other than Dr. Van Dyke, were not scientists and did not possess the requisite expertise to conduct necessary research and testing, KeraNetics was critically dependent on Dr. Van Dyke, his Know-How, and his laboratory at WFU and contractually undertook the obligation to support it financially.

33.     In order to gain access to research facilities, training for its employees, access to results of the research conducted under the SRA and other keratin-related programs overseen by Dr. Van Dyke, and to facilitate the transfer of the keratin-related technologies and Know-How on which KeraNetics depended for commercial success, KeraNetics entered into a Visiting Scientist Agreement ("VSA") with WFU. **Exhibit 6**.

34.     Under the VSA, KeraNetics' employees had broad access to WFU facilities, including primarily, Dr. Van Dyke's laboratory, as well as to Dr. Van Dyke himself and his

THE CREEKMORE
LAW FIRM PC

graduate students and other personnel. In particular, KeraNetics' principals and employees, including Burnett, Westmoreland and Johnson, attended Dr. Van Dyke's quarterly research group meetings. These were closed meetings of up to forty WFU employees who worked for Dr. Van Dyke or collaborated with his WFU research laboratory. At these meetings, there was extensive disclosure and discussion of ongoing research related to keratins and keratin biomaterials and which was confidential and proprietary to WFU and Dr. Van Dyke.

35.     Because of this broad access to WFU facilities and personnel and the results of ongoing, confidential keratin-based research, development and studies, the VSA contained specific provisions with respect to information, knowledge, inventions and discoveries resulting from KeraNetics' access to the Licensed Keratin Know-How. Specifically, KeraNetics assigned to WFU all inventions and discoveries, whether patentable or not, that would be conceived or reduced to practice by KeraNetics' scientists, whether working individually solely or jointly with WFU personnel, including Dr. Van Dyke. (**Exhibit 6**, § 3(a).) KeraNetics' scientists also were precluded from discussing, publishing, sharing or otherwise making any use of research performed on WFU premises to or with non-KeraNetics personnel, as all such research and resulting information was regarded as proprietary and confidential to WFU and Dr. Van Dyke. (**Exhibit 6**, § 4).

36.     KeraNetics was critically dependent on Dr. Van Dyke's expertise, extending to areas outside of the SRA including keratin manufacturing, medical product development and regulatory approval. In December 2009, KeraNetics and Dr. Van Dyke entered into a consulting agreement (the "Consulting Agreement") to address the need for KeraNetics to have access to Dr. Van Dyke's expertise and Know-How in these additional areas, particularly as it related to the development of products slated for use in healthcare, meeting the manufacturing

THE CREEKMORE
LAW FIRM PC

requirements of regulatory agencies such as the U.S. Food and Drug Administration ("FDA"), as well as training KeraNetics' employees in keratin manufacturing and purification processes. **Exhibit 7**.

37.     The Consulting Agreement provided, in relevant part:

The Company acknowledges Consultant's primary obligation is to Wake Forest University School of Medicine (WFU).  It is the intent of the parties that efforts and specific responsibilities under this Agreement be separate and distinct from those duties performed for WFU.  In the event of any conflict between this Agreement and any terms of employment between the Consultant and WFU, including work responsibilities and ownership of any resulting intellectual property, the terms and conditions of Consultant's employment with WFU will take precedence unless specific written arrangements have been made in advance between the Company and WFU.

**Exhibit 7**, §1.

38.     The Services Dr. Van Dyke was to provide under the Consulting Agreement included, among others, assisting the Company in the establishment and operation of a GLP[1] and GMP[2] laboratory, and training the Company's employees in keratin manufacturing and purification processes. **Exhibit 7**, Ex. A.   As KeraNetics and its employees had no prior experience in GLP, GMP or the manufacture of keratin materials, they were critically dependent on Dr. Van Dyke's expertise and Know-How in these endeavors.

39.     Previously, at Southwest Research Institute in San Antonio, Texas, from 1998 to 2004, Dr. Van Dyke developed, built and validated a large-scale keratin manufacturing system that was capable of producing kilograms of purified keratin materials.  In 2006 and 2007, he employed that expertise to lead a project to design a large-scale manufacturing system for producing keratin materials that would be compliant with GMP regulations.  In April 2007, a

THE CREEKMORE
LAW FIRM PC

---

[1] Good Laboratory Practice

[2] Good Manufacturing Practice

final report from this project was created which detailed, among many other things, extensive design details and process diagrams for the production of keratin materials on a large scale. **Exhibit 8**.

40.     Dr. Van Dyke's keratin manufacturing process became, and remains, the foundation for his continued keratin research, laboratory work and development of keratin-based materials.  As a critical component of the licensed Keratin Know-How, it also became the basis for the keratin manufacturing process implemented by KeraNetics.  Dr. Van Dyke spent numerous hours, meeting not less than weekly, with KeraNetics' employees Luke Burnett and Sarah Boyd.  Dr. Van Dyke specified the equipment to be purchased by KeraNetics in order to build and validate a keratin manufacturing system at KeraNetics based solely on Dr. Van Dyke's Know-How. KeraNetics could not have developed keratin manufacturing capabilities without Dr. Van Dyke's involvement and the use of the licensed Keratin Know-How.

41.     The keratin manufacturing process in use at KeraNetics is described in detail in what is called "Quality System" documentation, which is required by the FDA, and contains numerous standard operating procedures and quality control methods based on Dr. Van Dyke's Know-How, including equipment designs, manufacturing steps, process monitoring and control techniques, and final product quality testing procedures.  Importantly, many aspects of this Quality System documentation that arose from Dr. Van Dyke's Know-How are not available in any published paper, patent application, issued patent, or other document placed in the public domain by Dr. Van Dyke.

42.     WFU is responsible for managing the License, the SRA and the VSA (collectively, these three documents constitute the "Agreements") as they relate to KeraNetics'

THE CREEKMORE
LAW FIRM PC

use of the Keratin Know-How and Keratin Library, as well as all information and knowledge derived from access to WFU's facilities and Dr. Van Dyke's laboratory and keratin team.

43. Dr. Van Dyke is an intended third-party beneficiary of these Agreements and known to WFU, KeraNetics, Burnett, Westmoreland and Johnson inasmuch as they are expressly intended to benefit both WFU and Dr. Van Dyke by protecting WFU and Dr. Van Dyke's rights and providing financial compensation to both in exchange for KeraNetics' use of the licensed Keratin Know-How and the Keratin Library developed by Dr. Van Dyke.

44. The License obligates WFU to an important oversight role with respect to the operations of KeraNetics, its handling of all proprietary and confidential information belonging to WFU and Dr. Van Dyke to which KeraNetics gained access under the License and its performance under the License, particularly including ensuring KeraNetics makes all Milestone Payments and Royalty Payments when due. In this regard, the License required KeraNetics to actively report to WFU certain actions and activities, including sublicenses executed, clinical trials initiated, product approvals, sale, lease or disposition of Products, and payments made to KeraNetics.  (**Exhibit 5**, §§§§ 4.4, 5.2, 5.4 and 7.2)

45. The License required KeraNetics to keep extensive financial records (**Exhibit 5**, § 7.1) and make them available to WFU for examination annually (**Exhibit 5**, §§ 7.2-7.3) so that WFU could monitor KeraNetics' compliance with requirements of the License.

46. WFU has failed to properly, faithfully and dutifully exercise and fulfill this important role in monitoring KeraNetics' compliance with the License, and particularly in conducting a reasonable and proper financial review of KeraNetics' operations, books and records. WFU's failure in this regard has resulted in omissions and noncompliance by KeraNetics with the License going undetected or ignored and resulting in important Milestone

and Royalty payments not being made to WFU, a portion of which payments are due and owing to Dr. Van Dyke.

47. The License also allows WFU to designate two people to act in an oversight role and participate as non-voting observers at all Board of Directors meetings of KeraNetics so that WFU could ensure that all provisions of the License are met by KeraNetics. (**Exhibit 5**, § 5.11) Upon information and belief, WFU has failed to exercise this Board observation right, resulting in omissions and noncompliance by KeraNetics with the License going undetected or ignored.

48. KeraNetics currently is in noncompliance with the Agreements. WFU is failing and/or refusing to enforce material provisions of the Agreements against KeraNetics, causing significant harm and ongoing damage to Dr. Van Dyke and his research, as well as significant financial harm in monetary payments due but not being paid.

49. KeraNetics has made use of the licensed Keratin Know-How and the Keratin Library as the basis for filing patent applications on its own behalf, without notifying Dr. Van Dyke or WFU and in breach of the Agreements, including but not limited to the following:

   a. Burnett L, Boyd SA. Methods for extracting keratin proteins. US Patent No. 10,385,095, August 20, 2019;

   b. Burnett L, Kneller E, Tomblyn S. Low protein percentage gelling compositions. US Patent No. 10,279,045, May 7, 2019;

   c. Burnett L, Kneller E, Tomblyn S. Low protein percentage gelling compositions. US Patent No. 9.700,631, July 11, 2017;

   d. Burnett L, Falco E, Pattison L. Dermal fillers comprising keratin biomaterials. Int'l Patent App. No PCT/US2015/066040, December 16, 2015;

THE CREEKMORE
LAW FIRM PC

e. Burnett L, Kneller E, Falco E. White keratin compositions. US Patent App. No. 14/704211, May 5, 2015; and

f. Burnett L, Johnson C. Angiogenesis promoted by alpha-keratose. Int'l Patent App. No. PCT/US2012/051212, August 16, 2012.

50. WFU has failed to prevent these patent applications filed by KeraNetics and/or has failed to ensure that any allowable patent applications and use of the Keratin Know-How and Keratin Library have been made in accordance with the Agreements. By not exercising its oversight and management responsibilities over the operations of KeraNetics, WFU has allowed these breaches of the Agreements by KeraNetics.

51. In the case of patent applications KeraNetics has filed on its own behalf, the inventors (and/or their agents) have filed Information Disclosure Statements, Foreign References, and Non-Patent Literature documents with the United States Patent and Trademark Office as part of their required disclosures under 37 CFR 1.56. Upon information and belief, many of the documents KeraNetics has submitted have been taken directly from Dr Van Dyke's previous contributions to the Keratin Know-How and which are contained within the Keratin Library, with callous and knowing disregard for the confidentiality, inventorship or authorship of such materials.

52. More particularly, each of these patent applications and disclosed documents filed by KeraNetics incorporate manufacturing steps first developed by Dr. Van Dyke that are contained within the Keratin Library and licensed Keratin Know-How previously provided to KeraNetics' employees. These very employees who secured access to this licensed material and to Dr. Van Dyke himself, for purposes of instruction and tutelage in the development of this licensed Keratin Know-How, now falsely claim to be inventors on the technology underlying

THE CREEKMORE
LAW FIRM PC

the patents achieved by or in favor of KeraNetics. For example, every element in Claim 1 of US Patent No. 10,385,095, referenced above and attached as **Exhibit 9**, was developed independently by Dr. Van Dyke and is fully encompassed within the licensed Keratin Know-How and Keratin Library transferred to KeraNetics. More specifically, Claim 1 elements (a), (b) and (e) (*see* **Exhibit 9** at 6) are described by Dr. Van Dyke in a patent application detailing several of Dr. Van Dyke's inventions that was not fully prosecuted to issuance but which continued to remain within the Keratin Know-How. *See* **Exhibit 10** at 12. Claim 1 element (c) was described by Dr. Van Dyke more than a year before the formation of KeraNetics (*see* **Exhibit 11**), and again shown in **Exhibit 12**. Claim element (d) was described by Dr. Van Dyke in his laboratory notebook in 2007. **Exhibit 13**. These elements were routinely combined and utilized in Dr. Van Dyke's research, were included within the Keratin Library and licensed Keratin Know-How and were taught to KeraNetics' personnel under the Agreements.

53.     The licensed Keratin Know-How and other confidential information from within the Keratin Library reflect in detail Dr. Van Dyke's extensive protocols, methods and processes for producing and analyzing keratin materials, all of which were developed and reduced to writing and practice by Dr. Van Dyke prior to KeraNetics' formation. *See, e.g.*, **Exhibit 11**. These same methods, as well as discrete aspects of these methods, which are not available in the public domain, were shared with employees of WFU such as Burnett and Boyd, both of whom later became employees of KeraNetics and are now listed as inventors on many patent applications filed on KeraNetics behalf, with KeraNetics listed as the sole assignee.

54.     In fact, Dr. Van Dyke's keratin production protocol appears in the lab notebook used by Boyd while she was an employee of WFU. **Exhibit 14**. These same methods are now in several patent applications that KeraNetics has filed on its own behalf, listing itself as the

THE CREEKMORE
LAW FIRM PC

assignee, with Boyd, along with Burnett and other KeraNetics' employees listed as the inventors, without ever having disclosed or discussed these applications with Dr. Van Dyke or, upon information and belief, WFU. *See, e.g.,* **Exhibit 15**. The Methods For Extracting Keratin Proteins detailed therein utilize high speed centrifugation methods described more than 10 times in Dr. Van Dyke's WFU laboratory notebooks prior to this filing date, such as on June 20, 2007, more than a year before the formation of KeraNetics. See **Exhibit 13**

55.    Other elements of Dr. Van Dyke's keratin manufacturing process that have been lifted by KeraNetics from the licensed Keratin Know-How and are reflected in KeraNetics' patent application at **Exhibit 9** include: (i) selection of starting material for keratin production, (ii) details of the closed-loop TFF system, (iii) methods to monitor important keratin production parameters, (iv) methods to freeze dry keratin products, (v) methods to verify final product composition and quality, and (vi) methods for producing "meta-keratins," a term Dr. Van Dyke coined for mixtures of two different types of keratin biomaterials manufactured using his Know-How.

56.    KeraNetics knew or should have known this was use of the licensed Keratin Know-How and confidential information from the Keratin Library.  In fact, in a final rejection document dated March 23, 2017, the examiner rejected the application and claims as "unpatentable over Van Dyke (US 20070298070)." **Exhibit 16** at 4-6, ₱5.  The prosecution history of this and other of KeraNetics' patent applications are replete with references to the incorporation of the prior work of Dr. Van Dyke, rather than evidence of novel, independent experiments conducted by KeraNetics. Disclosure of these elements of Dr. Van Dyke's keratin production methods in this patent application gives strong indication that these same methods have been included within KeraNetics' internal company documents such as Standard

THE CREEKMORE
LAW FIRM PC

Operating Procedures and Quality System documents, with which KeraNetics must comply in order to produce keratin-containing products in accordance with FDA requirements.

57.    KeraNetics has applied for and prosecuted numerous applications across the globe, in multiple languages, each time incorporating and disclosing numerous elements of Dr. Van Dyke's Know-How.  In the majority of cases, KeraNetics has been unable to overcome the rejections of the patent offices and has failed to obtain granted claims, thereby leaving confidential information obtained from within the licensed Keratin Know-How and Keratin Library exposed in the public domain without patent protection around them.

58.    KeraNetics, Westmoreland, Johnson and Burnett have caused the patent applications to be prosecuted on KeraNetics' behalf with knowledge that they incorporated the licensed Keratin Know-How and other confidential information from the Keratin Library; with knowledge that they were not entitled to publicly disclose this confidential information under the Agreements; and with knowledge that the named inventors did not invent the methodologies and processes disclosed therein; and knowing that by doing so they would be causing Dr. Van Dyke harm to his ongoing research and employment as well as financial damage to both Dr. Van Dyke and WFU.

59.    WFU has knowingly, or at least negligently, allowed these breaches to occur, with the foreseeable damage to both it and Dr. Van Dyke's interests, by failing to actively oversee KeraNetics' activities and/or require regular reporting on such activities by KeraNetics, as required by the License, and by failing to require KeraNetics' adherence to and compliance with the Agreements' prohibitions on its use of the licensed Keratin Know-How and materials from within the Keratin Library.

THE CREEKMORE
LAW FIRM PC

60.     Disclosure of these elements of Dr. Van Dyke's keratin production methods in these patent applications gives strong indication that these same methods have been included within KeraNetics' internal company documents such as Standard Operating Procedures and Quality System documents, with which KeraNetics must comply in order to produce keratin-containing products in accordance with FDA requirements.

61.     In KeraNetics' recent application for FDA Clearance of its KeraStat® Gel, KeraNetics includes several elements of Dr. Van Dyke's Know-How and information from the Keratin Library, including: 1) recommended dressing change interval (**Exhibit 17** at 1);  2) heavy metals chelation step (**Exhibit 17** at 2 and 4); 3) limitations on product use (**Exhibit 17** at 6); 4) use of peracetic acid as an oxidizing agent for the production of keratin biomaterials (**Exhibit 17** at 4); 5) composition of meta-keratins (**Exhibit 17** at 7); 6) use of Chinese hair as source of keratin (**Exhibit 17** at 8); and 7) use of gamma irradiation for product sterilization (**Exhibit 17** at 8). KeraNetics' inclusion of these materials in a regulatory filing constitutes a use from which KeraNetics has now received tremendous value, that being the legal right to sell KeraStat Gel in interstate commerce in the United States.

62.     In late July, 2012, Dr. Van Dyke accepted an appointment at Virginia Tech, in Montgomery County, Virginia. He informed KeraNetics and WFU soon thereafter and began preparations to open a research lab at Virginia Tech.

63.     Also in July, 2012, KeraNetics and Dr. Van Dyke entered into another Consulting Agreement that extended through Dr. Van Dyke's move to Virginia Tech.  At that time, Dr. Van Dyke was assisting KeraNetics in preparing FDA submissions and in applying for grant funding. Dr. Van Dyke alone possessed the necessary expertise to prepare successful applications for the grants and to carry out the research funded by the grants.  Because

KeraNetics' own staff had only limited expertise in keratin biomaterials and lacked scientific publications in the field, the grant applications needed to be bolstered by Dr. Van Dyke's acclaim in the field and by his involvement as a key investigator with extensive expertise in keratin biomaterials research.

64.     KeraNetics and Dr. Van Dyke agreed that the grants would be structured as academic-industry partnerships, with Dr. Van Dyke's academic lab at Virginia Tech functioning as the main research facility and providing the necessary keratin biomaterials expertise. KeraNetics therefore executed a three-year research agreement with Virginia Tech in November, 2012.

65.     During the 2012 to 2013-time frame, the relationship between KeraNetics, Burnett, Westmoreland and Johnson, on the one hand, and Dr. Van Dyke, on the other, began to erode. Despite Dr. Van Dyke having been KeraNetics' founder and largest equity holder, as well as continuing in his roles as officer, director and manager of KeraNetics, Defendants were systematically excluding Dr. Van Dyke from management operations of KeraNetics and making baseless claims of unfair competition against him as the alleged grounds for keeping KeraNetics' business information from him.

66.     Through the Fall of 2012, KeraNetics, Burnett, Westmoreland and Johnson made increasingly frequent and aggressive inquiries into Dr. Van Dyke's research plans and activities at Virginia Tech. They also contacted the President of Virginia Tech Intellectual Properties and made false statements to him that Dr. Van Dyke had violated his agreements with KeraNetics and that Dr. Van Dyke had committed violations of fiduciary, for the purpose of trying to impair Dr. Van Dyke's professional relations and research endeavors at Virginia Tech. In or about June, 2013, KeraNetics, acting through one or more of Burnett,

THE CREEKMORE
LAW FIRM PC

Westmoreland and Johnson, wrote to Virginia Tech in Montgomery County, Virginia, and terminated the Research Agreement with Virginia Tech, thereby depriving Dr. Van Dyke's research lab at Virginia Tech of $414,226 in funding that should have been forthcoming. KeraNetics did this with the intention of harming Dr. Van Dyke's ongoing keratin research endeavors and his standing at Virginia Tech.

67. On June 11, 2013, KeraNetics, acting through one or more of Burnett, Westmoreland and Johnson, sent a cease-and-desist letter to Dr. Van Dyke in Montgomery County. Thereafter, for a period of weeks or months, multiple letters were exchanged by and between counsel for each of the two sides, all communicating with Dr. Van Dyke in and from Montgomery County, Virginia.

68. By November, 2013, the dispute between KeraNetics, Burnett, Westmoreland, Johnson and Dr. Van Dyke had come to a head, and Dr. Van Dyke commenced litigation against them in Montgomery County Circuit Court in Virginia alleging various breaches of contracts, derelictions of corporate duties as well as tortious conduct by Defendants that were impairing Dr. Van Dyke's financial returns he anticipated from various agreements and contracts as well as damaging his ongoing keratin research and development work at Virginia Tech.

69. Dr. Van Dyke sent extensive discovery requests to Defendants, through which Dr. Van Dyke attempted to ascertain information about the operation and then-ongoing research and development work of KeraNetics to which he had been excluded. KeraNetics resisted, objected and either failed or refused to make full and complete production of the requested information during the course of the litigation. Ultimately, the litigation was

THE CREEKMORE
LAW FIRM PC

resolved through settlement in the Fall of 2014, without Dr. Van Dyke receiving much of the internal business information of KeraNetics that he sought.

70. Upon information and belief, the dispute and litigation effort by Dr. Van Dyke caused KeraNetics and its officers, Burnett, Westmoreland and Johnson, among others, to become more guarded and surreptitious about the manner and methods by which KeraNetics managed its business and internal affairs going forward.

71. To this end, KeraNetics, Burnett, Westmoreland and Johnson began to engage in a corporate shell game through which they sought to disguise and conceal from Dr. Van Dyke and WFU the keratin work, product development and commercialization efforts they had planned, as well as the unlawful transfers of the licensed Keratin Know-How upon which such future production and commercialization efforts depended.

72. On or about September 4, 2013, KeraNetics had created an affiliated company named Keratin Cosmetic Sciences, LLC, the purpose of which was to explore the use of Dr. Van Dyke's keratin biomaterials in cosmetic applications such as hair, skin and nail care. The initial managers of the company included Defendants Johnson and Westmoreland, who remained principals of KeraNetics.

73. In furtherance of their scheme of deception and concealment, Defendants soon thereafter changed the name of Keratin Cosmetic Sciences, LLC to Reason to Believe, LLC. Melisse Shaban was named the Executive Manager of the company, and Kim Westmoreland was named the Registered Agent. Both were affiliated with KeraNetics. Upon information and belief, this change was motivated, at least in part, because Dr. Van Dyke had specifically inquired about KeraNetics' relationship and contractual dealings with Melisse Shaban in the prior litigation, though Defendants there resisted full disclosure of the same.

THE CREEKMORE
LAW FIRM PC

74.     Sometime thereafter, Defendants again changed the name of Reason to Believe, LLC to Virtue Labs, LLC.  Melisse Shaban and Aaron Christian Simmons, both of whom were affiliated with KeraNetics, were identified as the company officials for Virtue Labs.  In addition, Erin Falco became Virtue Lab's first Chief Scientific Officer. Dr. Falco previously was employed by KeraNetics and was trained in keratin production methods by Dr. Van Dyke. She had extensive knowledge of the licensed keratin Know-How, the Keratin Library, and keratin production methods established at KeraNetics by Dr. Van Dyke. Upon information and belief, Dr. Falco took these production methods with her to Virtue Labs and established the same capabilities as were in use at KeraNetics.

75.     Also during this same time period, Keratin Biosciences Inc. was formed on May 18, 2018 as a Delaware corporation.  On June 11, 2018, Keratin Biosciences applied for a certificate of authority to transact business in North Carolina. Defendant Westmoreland was then identified as its President, Treasurer and Secretary.  Continuing the shell game designed to confuse and obscure their conduct, on December 19, 2019, KeraNetics, Burnett, Westmoreland and/or Johnson caused Keratin Biosciences Inc.'s to be renamed KeraNetics, Inc., resulting in both KeraNetics, LLC and KeraNetics, Inc. active and doing business in North Carolina.

76.     Upon information and belief, KeraNetics, Burnett, Westmoreland and Johnson have combined and conspired to create these alternate companies as Affiliates of KeraNetics for the purpose of concealing their improper transfer of licensed Keratin Know-How and confidential information from within the Keratin Library and to disguise or conceal events triggering Milestone and Royalty payments under the License from both WFU and Dr. Van Dyke.

THE CREEKMORE
LAW FIRM PC

77. Virtue Labs is in the business of producing cosmetic products from keratin materials using a process that relies on the same raw material, equipment designs, manufacturing steps, process monitoring and control techniques, and final product quality testing procedures as KeraNetics, which all employ the licensed Keratin Know-How and draw from confidential information within the Keratin Library. *See generally*, **Exhibit 18**.

78. Dr. Van Dyke has acquired a keratin sample from Virtue Labs for the purpose of determining through testing whether the Virtue Labs keratin sample was produced through keratin production methods that were the same as, or consistent with, those he has developed and which are included and described within the licensed Keratin Know-How and Keratin Library. **Exhibit 18** at ¶ 3.

79. The results of the series of initial tests Dr. Van Dyke conducted on the Virtue Labs keratin sample were all consistent with a keratin sample having been produced from Dr. Van Dyke's own keratin production methods that are described in the Keratin Know-How licensed to KeraNetics. **Exhibit 18** at ¶ 11.

80. Upon information and belief, KeraNetics has shared the licensed Keratin Know-How and confidential information from within the Keratin Library with Virtue Labs, LLC without securing any permission, approval or authority from WFU for doing so, and by avoiding alternative provisions in the Agreements which would inure to the financial benefit of both WFU and Dr. Van Dyke. *See* **Exhibit 18** at ¶ 3.

81. The License grants KeraNetics the right to sell keratin, keratose or other Derivatives thereof to Virtue Labs as a Raw Material Product, as that is defined in the License, (**Exhibit 5** §1.11), and requires a license royalty payment to WFU equal to 15% of Net Sales,

THE CREEKMORE LAW FIRM PC

and never less than 9% of Net Sales. **Exhibit 5**, §§ 3.6, 3.9. To date, KeraNetics has made no royalty payments under these provisions of the License.

82. Alternative, the License grants KeraNetics broad rights to sublicense the licensed Keratin Know-How to Virtue Labs, (**Exhibit 5**, §§ 2.1, 2.2), but requires pass through payments to WFU of either 50% or 25%, depending upon the level of funding to date by KeraNetics under the SRA, (**Exhibit 5**, §§ 3.10, 3.11), as well as a percentage based on the Annual Net Sales of Product by the sublicensee. (**Exhibit 5**, § 3.12.) To date, KeraNetics has made no payments under these provisions of the License.

83. Virtue Labs necessarily would have conducted clinical testing of their products before launch, which in and of itself would be a Milestone Event under the License (**Exhibit 5**, § 3.9(i)), for which KeraNetics would have owed WFU a Milestone Payment of $50,000, of which Dr. Van Dyke would have received $20,000. When Virtue Labs recognized its First Commercial Sale of Product developed with the licensed Keratin Know-How, KeraNetics would have owed WFU a Milestone Payment of $250,000 under the License, (**Exhibit 5**, § 3.9(v)), of which Dr. Van Dyke would have received $100,000. To date, KeraNetics has made no such Milestone Payments to WFU.

84. WFU has failed in its oversight role to detect these obvious breaches of the Agreements by KeraNetics despite significant information in the public domain regarding Virtue Labs, its management and operations, product offerings, methods for producing keratin, its ties to KeraNetics and likely use of the WFU licensed Keratin Know-How. *See, e.g.,* **Exhibits 19, 20**.

THE CREEKMORE
LAW FIRM PC

85.     Dr. Van Dyke brought his concerns about Virtue Labs' apparent use of the WFU Licensed Keratin Know-How to the attention of WFU.  WFU dismissed Dr. Van Dyke's concerns and did little to nothing to bring KeraNetics into compliance with the Agreements.

86.     Articles and public disclosures reflect that Virtue Labs' annual revenues were approximately $19 million through 2018 (**Exhibit 21**), $25 million in 2020 (**Exhibit 22**), and projected to be $150 million by 2021.  **Exhibits 23** at 16. Upon information and belief, Virtue Labs is producing no products that do not depend upon or that are not derived from the licensed Keratin Know-How that it has obtained from KeraNetics.

87.     KeraNetics itself has reached certain Milestones Events, for which WFU has been unwilling or unable to collect payments from KeraNetics as required.

88.     On June 2, 2017, KeraNetics announced that it had achieved FDA Approval for one of its products, KeraStat Gel. **Exhibit 24**.  Section 3.9(iv) of the License (**Exhibit 5**) requires that, upon the receipt of Marketing Approval in the US, KeraNetics is obligated to make a $100,000 Milestone Payment to WFU, $40,000 of which would be Dr. Van Dyke's share. KeraNetics has not made this Milestone Payment, and WFU has failed or refused to compel KeraNetics to do so.

89.     Upon the First Commercial Sale of KeraStat Gel, an additional Milestone Payment of $250,000 would have been due by KeraNetics to WFU, (**Exhibit 5**, § 3.9(v)), of which Dr. Van Dyke's share would be $100,000.  KeraNetics has not made this Milestone Payment, and WFU has failed or refused to compel KeraNetics to do so.

90.     Additionally, KeraNetics would owe a Royalty Payment ranging from 4% to 8.5% of Net Sales - depending on the actual amount of annual Net Sales - to WFU, of which

THE CREEKMORE
LAW FIRM PC

Dr. Van Dyke's share would be 40%. **Exhibit 5**, § 3.1. KeraNetics has not made this Royalty Payment, and WFU has failed or refused to compel KeraNetics to do so.

91.     On March 21, 2018, KeraNetics announced that it was initiating a clinical trial of KeraNetics' KeraStat Cream product. **Exhibit 25**.  Section 3.9(i) of the License (**Exhibit 5**) requires a $50,000 Milestone Payment by KeraNetics to WFU upon the occurrence of this Milestone Event, $20,000 of which would have been Dr. Van Dyke's share. KeraNetics has not made this Milestone Payment, and WFU has failed or refused to compel KeraNetics to do so.

92.     Section 3.9(v) of the License (**Exhibit 5**) requires that, upon the First Commercial Sale of its KeraStat Cream, KeraNetics would have owed to WFU a Milestone Payment of $250,000, of which 40%, or $100,000, is Dr. Van Dyke's share. KeraNetics has not made this Milestone Payment, and WFU has failed or refused to compel KeraNetics to do so.

93.     In total, between KeraNetics and Virtue Labs, more than $1,700,000 in Milestone Payments, royalties, penalties and interest are due to WFU from KeraNetics, pursuant to the License. Of this total, Dr. Van Dyke's share would be more than $680,000. Minimally, these include, but are not limited to:

a.     Milestone Payment of $250,000 for Virtue Labs' achieving a First Commercial Sale of Product, on or about October 1, 2016;

b.     Milestone Payment of $100,000 for KeraNetics' achieving Market approval of KeraStat Gel, on or about June 2, 2017;

c.     Milestone Payment of $50,000 for KeraNetics' achieving a Clinical Trial of its KeraStat Cream, on or about March 21, 2018;

d.     Royalties of $222,000 due on Virtue Labs' Annual Net Sales of $7,400,000, achieved on December 31, 2017;

THE CREEKMORE
LAW FIRM PC

e.   Royalties of $330,000 due on Virtue Labs' Annual Net Sales of $11,000,000, achieved on December 31, 2018;

f.   Royalties of $750,000 due on Virtue Labs' Annual Net Sales of $25,000,000, achieved on December 31, 2019.

94.   WFU has remained knowingly and willfully in the dark as to KeraNetics use and/or improper transfer of the licensed Keratin Know-How and Keratin Library, has failed or refused to exercise its monitoring and oversight obligations pursuant to the License, has failed or refused to require KeraNetics to make the above payments due to WFU under the License; and has willfully tolerated KeraNetics' ongoing breaches of the License and other Agreements, all to its own detriment and to the ongoing detriment of Dr. Van Dyke.

95.   Despite communications from Dr. Van Dyke for the purpose of trying to compel WFU to intercede and take action to enforce KeraNetics' compliance with the Agreements and to require KeraNetics to bring its License payments current, WFU has failed or refused to do so, has secured no monetary payments from KeraNetics, and has made no payments to Dr. Van Dyke as would be due under the License.

96.   Burnett, Westmoreland and Johnson, acting for themselves individually and acting through and for KeraNetics and/or Virtue Labs, have combined and acted in concert for the intended purpose of defrauding both WFU and Dr. Van Dyke and misappropriating the licensed Keratin Know-How and Keratin Library for their own purposes. Upon information and belief, each participated in the prior litigation with Dr. Van Dyke and the discovery disputes over company information sought by Dr. Van Dyke. From that involvement, each became personally motivated to thwart WFU and Dr. Van Dyke's future ability to access and gain information about the manner in which they were unlawfully transferring the licensed Keratin

THE CREEKMORE
LAW FIRM PC

Know-How and information from within the Keratin Library in violation of the Agreements with WFU.

97. Burnett, Westmoreland and Johnson individually and personally have realized enhanced financial returns through the apparent, but feigned, successes of KeraNetics and Virtue Labs, built on improper use of the licensed Keratin Know-How and Keratin Library. Upon information and belief, through their misappropriation and unlawful transfer of the licensed Keratin Know-How and Keratin Library, Burnett, Westmoreland and Johnson have derived enhanced personal profits and financial return through Virtue Labs and other affiliated companies using the licensed keratin resources without sharing the proceeds with WFU and Dr. Van Dyke as required through Milestone and Royalty Payments. Additionally, they have been able to enhance the stature and position of these affiliated companies by attracting management expertise into the entity that now is Virtue Labs and have raised in excess of $41,000,000 in investment funding for that venture. Each of these individuals holds significant personal interests in both KeraNetics and Virtue Labs, directly or indirectly, which have been enhanced financially through this unlawful activity.

98. Each of these three individual Defendants has secured enhanced professional stature and standing, along with the financial benefits attendant to the same, from the perceived successes they have achieved through unlawful use of the licensed Keratin Know-How and Keratin Library. Defendant Burnett has now been promoted to Chief Executive Officer of KeraNetics. Defendant Westmoreland has secured several board positions such as NVOLVE by N2 Medical Solutions (Chairman), Cardiac Mri Inc (Board Member), and Dioko Ventures (Board of Advisors). Defendant Johnson has secured the position of Vice President and Executive Director of Wake Forest University Charlotte Campus.

THE CREEKMORE
LAW FIRM PC

## COUNT I
### Breach of Dr. Van Dyke's Employment Agreement by WFU

99.     Paragraphs 1 through 98 are incorporated by reference as if fully restated herein.

100.    WFU has breached the terms of the employment agreement with Dr. Van Dyke, as encompassed collectively within Exhibits 1, 2 and 4,

    a.   by failing to protect Dr. Van Dyke's ongoing personal and pecuniary interests in the Keratin Know-How, the Keratin Library and derivative and ongoing inventions and scientific research and discoveries therefrom;

    b.   by failing to enforce the terms of the Agreements against KeraNetics, to ensure the protection and safeguarding of the licensed keratin resources, to which Dr. Van Dyke had a reasonable and legitimate expectation pursuant to his employment agreement with WFU; and

    c.   by failing to ensure, provide and remit maximum financial return to Dr. Van Dyke, as described above, by failing to collect from KeraNetics and/or its Affiliates, including Virtue Labs, those payments due to WFU under the License, a share of which is owed to Dr. Van Dyke and to which Dr. Van Dyke had a reasonable and legitimate expectation pursuant to his employment agreement with WFU.

101.    By failing to exercise reasonable care in the management, oversight and enforcement of the Agreements against KeraNetics, WFU has allowed valuable confidential and proprietary information and Know-How belonging to Dr. Van Dyke to be used, disclosed and transferred to third parties by KeraNetics, and incorporated into patents, patent applications and regulatory submissions KeraNetics has filed on its own behalf, without preventing

THE CREEKMORE
LAW FIRM PC

unauthorized disclosure and/or disallowed transfer, and/or without collecting that consideration guaranteed to Dr. Van Dyke pursuant to the terms of the Agreements between WFU.

102.    WFU's breaches and failures in this regard have caused considerable financial loss, damage and injury to Dr. Van Dyke, to his research, his standing in the research community, and his career as a result.

103.    WFU's breaches and failures have proximately and directly caused significant financial harm to Dr. Van Dyke in the form of lost compensation to which he and WFU contractually agreed as part of his employment with WFU from the use, licensing and management of the Keratin Know-How and Keratin Library developed by Dr. Van Dyke.

104.    WFU's breaches and failures have proximately and directly resulted in financial harm to Dr. Van Dyke in Montgomery County through the diminution in value of the licensed Keratin Know-How and Keratin Library through both WFU's derelictions and omissions in management and oversight of KeraNetics under the License, on which keratin resources Dr. Van Dyke's career depends.

**COUNT II**
**Breach of the License by WFU and KeraNetics**

105.    Paragraphs 1 through 98 are incorporated by reference as if fully restated herein.

106.     WFU and KeraNetics entered into the License with the express intention that both WFU and Dr. Van Dyke would be known and intended financial beneficiaries of the monetary payments that KeraNetics undertook to make pursuant to the License.

107.    WFU undertook obligations under the License, as stated in detail above, including but not limited to managing and safeguarding the licensed Keratin Know-How and Keratin Library, managing KeraNetics' performance under and compliance with the License,

THE CREEKMORE
LAW FIRM PC

and ensuring that all financial payments due and owing to WFU were made by KeraNetics and that Dr. Van Dyke received his contractually guaranteed share thereof.

108. KeraNetics undertook the obligations to manage and safeguard the licensed Keratin Know-How and Keratin Library, to use the licensed keratin resources consistent with the License, and to make all monetary payments due under the License to WFU with specific knowledge, understanding and agreement that such payments would be shared with Dr. Van Dyke as the inventor of the licensed Keratin Know-How and Keratin Library.

109. Both WFU and KeraNetics received a direct financial benefit under the License from Dr. Van Dyke as inventor of the licensed Keratin Know-How and Keratin Library.

110. Both WFU and KeraNetics undertook their respective obligations under the License knowing that Dr. Van Dyke had a reasonable, contractual expectation to remuneration for his inventorship of the licensed keratin resources through the financial returns to be generated by KeraNetics and WFU under the License.

111. Each of WFU and KeraNetics has knowingly, willfully, intentionally and purposefully breached its obligations under the License, failing to perform entirely as obligated and as detailed above.

112. WFU and KeraNetics' mutual, respective and collective breaches of their obligations under the License have had the known, predictable and foreseeable result of proximately and directly causing financial injury and damage to Dr. Van Dyke, both in the past, presently and continuing into the future.

113. Dr. Van Dyke has suffered the loss of contractually guaranteed and expected financial compensation from the payments KeraNetics was obligated to make to WFU under the License, which damage has been realized by Dr. Van Dyke in Montgomery County.

THE CREEKMORE
LAW FIRM PC

114.    Dr. Van Dyke has suffered the loss of value of the licensed Keratin Know-How and Keratin Library through both WFU's derelictions and omissions in management and oversight of KeraNetics under the License and through KeraNetics' knowing, purposeful and willful misuse, misappropriation, transfer and disclosure of the licensed keratin resources, on which Dr. Van Dyke's career depends.

## COUNT III
### Breach of Fiduciary Duty by WFU

115.    Paragraphs 1 through 98 are incorporated by reference as if fully restated herein.

116.    The Agreements entered into between WFU and Dr. Van Dyke placed WFU in a fiduciary position of trust relative to Dr. Van Dyke's personal and pecuniary interests in and to the Keratin Know-How, including the Keratin Library, and obligated WFU to manage and oversee and safeguard the value of each and to ensure a maximum return to Dr. Van Dyke from their reasonable and proper commercial use and exploitation as contemplated by the employment agreement by and between WFU and Dr. Van Dyke.

117.    The Agreements entered into between WFU and KeraNetics, of which Dr. Van Dyke is a known and intended third-party beneficiary, placed WFU in a fiduciary position of trust relative to Dr. Van Dyke's personal and pecuniary interests in and to the Keratin Know-How and Keratin Library to which KeraNetics gained access thereunder, and obligated WFU to manage and oversee and safeguard the value of these confidential and proprietary keratin resources and to ensure a maximum financial return to Dr. Van Dyke from their reasonable and proper commercial use and exploitation by KeraNetics, and to ensure the protection of their value going forward, all as contemplated by all of the Agreements.

THE CREEKMORE
LAW FIRM PC

118.     WFU has breached its fiduciary duties to Dr. Van Dyke under all the Agreements by its wholesale, reckless, willful and knowing mismanagement of the License, specifically, and the Agreements, generally,

a.   by failing to take reasonable care to put in place systems, procedures and methodologies that were adequate, reasonable, necessary and customary for managing the relationship with KeraNetics, and the operations of KeraNetics under the Agreements in a way that would ensure compliance by KeraNetics with the Agreements;

b.   by failing to prevent KeraNetics and/or its Affiliates, including Virtue Labs, and Burnett, Westmoreland and Johnson from misappropriating and usurping the licensed keratin resources for their own commercial purposes and financial advantage and gain without proper compensation to WFU and Dr. Van Dyke under the License;

c.   by failing to ensure that patent applications prosecuted by KeraNetics, Burnett, Westmoreland and/or Johnson contained accurate and truthful information as to inventorship of the keratin technology and Know-How described therein;

d.   by failing to prevent KeraNetics from making public disclosure of the confidential and trade secret information contained within the licensed Keratin Know-How and Keratin Library, thereby degrading its value to Dr Van Dyke going forward;

e.   by failing to prevent KeraNetics from transferring the licensed Keratin Know-How to Virtue Labs outside of the scope of the License and without

THE CREEKMORE
LAW FIRM PC

adequate and proper compensation to WFU and Dr. Van Dyke for so doing; and,

    f.   by failing to ensure KeraNetics' compliance with the terms of the Agreements, generally, and the License specifically, and ensuring payment of all monetary compensation owed to WFU and Dr. Van Dyke thereunder.

119.    As a result of these breaches of fiduciary duties, Dr. Van Dyke has been seriously, proximately and directly injured, causing him to suffer financial damages, both presently in the form of lost compensation owed under the License, and in the future through degradation of the value of the licensed Keratin Know-How and Keratin Library, all of which damage has been recognized by Dr. Van Dyke in Montgomery County.

**COUNT IV**
**Misappropriation of Trade Secrets by WFU, KeraNetics,**
**Virtue Labs, Burnett, Westmoreland and Johnson**
**In Violation of Virginia Code §59.1-336 *et seq.***

120.    Paragraphs 1 through 98 are incorporated by reference as if fully restated herein.

121.    The Keratin Know-How and Keratin Library constitute valuable trade secrets inasmuch as they have independent economic value to Dr. Van Dyke and others in the relevant field of keratin-based research and development because they have been developed by Dr. Van Dyke over many years of carefully guarded scientific research and development; they are not generally known to, or readily ascertainable by proper means by others in the field who would be able to derive economic value from their disclosure and use; they have been closely guarded by Dr. Van Dyke since development and have only been shared or divulged to WFU and KeraNetics under the protection of Dr. Van Dyke's employment agreements with WFU and the Agreements between WFU and KeraNetics, which explicitly govern their proper and possible uses by KeraNetics; and they have great financial value in and of themselves by affording to

THE CREEKMORE
LAW FIRM PC

anyone in their possession a significant competitive advantage in the marketplace of keratin-based research, development and product commercialization.

122. Each of KeraNetics and Virtue Labs, working jointly with and aided and abetted directly by Burnett, Westmoreland and Johnson, all of whom have independent, direct and personal knowledge of the impropriety of their conduct, has misappropriated Dr. Van Dyke's trade secrets in the keratin resources by

a. incorporating the licensed Keratin Know-How and Keratin Library into illegitimate and inaccurate patent applications and information disclosures and filed with the US Patent and Trademark Office;

b. incorporating the licensed Keratin Know-How and Keratin Library into commercial product development without disclosing the same to WFU under the Agreements or remitting to WFU compensation therefor as required by the License; and

c. by diverting the licensed Keratin Know-How and Keratin Library for the separate, independent commercial advantage and gain of KeraNetics and Virtue Labs, and the resulting personal and individual financial benefit and gain of Burnett, Westmoreland and Johnson, none of which they could have achieved on their own without such misappropriation.

123. Each of KeraNetics, Virtue Labs, Burnett, Westmoreland and Johnson knew that their acquisition, use and disclosure of the licensed Keratin Know-How and Keratin Library in the manner and for the purposes described above was not in compliance with the Agreements that allowed access to and governed their use of the Keratin Know-How and Keratin Library.

THE CREEKMORE
LAW FIRM PC

{00184410 1 }

36

124. Burnett, Westmoreland and Johnson had independent and personal knowledge of the same as actors intimately, directly and personally involved in negotiating, executing and effectuating the Agreements with WFU, and through direct and personal participation in the relationship between WFU and KeraNetics created by the same. Their direct knowledge of the same is imputed directly to both KeraNetics and Virtue Labs to the extent that they acted for or on behalf of either or both.

125. WFU has been fully complicit in, and has allowed this misappropriation of the trade secrets contained within the Keratin Know-How and the Keratin Library

      a. by willfully, recklessly and knowingly failing and refusing to oversee, manage, monitor and control the relationship between WFU and KeraNetics established by the Agreements;

      b. by willfully, recklessly and knowingly failing and refusing to ensure and enforce KeraNetics' compliance with the Agreements, including proper use and protection of the trade secrets licensed to KeraNetics within the Keratin Know-How and Keratin Library;

      c. by willfully, recklessly and knowingly failing to guard against, prevent, correct or remedy KeraNetics' improper use, disclosure and transfer of the trade secrets to which it gained access under the Agreements; and

      d. by willfully, recklessly and knowingly failing to guard against, prevent, correct or remedy Virtue Labs' improper acquisition, use and disclosure of the trade secrets to which it gained improper access through the unlawful acts of KeraNetics, Burnett, Westmoreland and Johnson.

THE CREEKMORE
LAW FIRM PC

126.     Each of KeraNetics, Virtue Labs, Burnett, Westmoreland and Johnson have benefited from their misappropriation and conversion of the Keratin Know-How and Keratin Library to their own uses without having to develop the same independently, thereby saving themselves a decade or more of research and development time and costs, and gaining for themselves a competitive advantage that they otherwise would not be able to enjoy by immediately developing and launching products into the marketplace and receiving the financial benefits therefrom.

127.     Each of WFU, KeraNetics, Virtue Labs, Burnett, Westmoreland and Johnson knew or should have known such misappropriation of Dr. Van Dyke's valuable trade secrets would cause him injury in his trade, occupation, profession and professional standing, including with respect to his standing at Virginia Tech, by impairing the future financial success of his keratin-based research and development and likely success and realization of economic value from the future commercialization of keratin-based products.

128.     Each of WFU, KeraNetics, Virtue Labs, Burnett, Westmoreland and Johnson took their collective actions and committed their collective breaches and derelictions of duties with the collective and shared intention of benefitting each other and themselves jointly and severally with blatant disregard for the known and foreseeable direct and proximately resulting financial and professional harm and detriment of Dr. Van Dyke, which he has suffered in Montgomery County.

129.     Each of WFU, KeraNetics, Virtue Labs, Burnett, Westmoreland and Johnson have acted with willful, purposeful and malicious intent, or, at a minimum, with reckless and deliberate disregard for Dr. Van Dyke's rights, in committing these acts.

THE CREEKMORE
LAW FIRM PC

130.    Dr. Van Dyke has been significantly, proximately and directly damaged by this misappropriation of his trade secrets and the resulting degradation in value of the Keratin Know-How and the Keratin Library, which damage is continuing and worsening as KeraNetics and Virtue Labs continue to make unlawful use of the Keratin Know-How and Keratin Library. This damage has impaired Dr. Van Dyke's ongoing keratin research at Virginia Tech and the prospects for expanding and growing such research to other commercial endeavors.

**COUNT V**
**Conversion by KeraNetics, Virtue Labs, Burnett, Westmoreland and Johnson**

131.    Paragraphs 1 through 98 are incorporated by reference as if fully restated herein.

132.    The Keratin Know-How and Keratin Library constitute a valuable property right of Dr. Van Dyke. They have been developed by Dr. Van Dyke over many years of carefully guarded scientific research and development; they are not generally known to, or readily ascertainable by proper means by others in the field who would be able to derive economic value from their disclosure and use; they have great financial value in and of themselves by affording to anyone in their possession a significant competitive advantage in the marketplace of keratin-based research, development and product commercialization; they have been closely guarded by Dr. Van Dyke since development; and they have only been shared with or divulged to WFU and KeraNetics under the protection of Dr. Van Dyke's employment agreements with WFU and the Agreements between WFU and KeraNetics, which explicitly govern their proper and possible uses by KeraNetics.

133.    Each of KeraNetics and Virtue Labs, working jointly with and aided and abetted directly by Burnett, Westmoreland and Johnson, all of whom have independent, direct and personal knowledge of the impropriety of their conduct, has converted the Keratin Know-How and Keratin Library to their own uses

THE CREEKMORE
LAW FIRM PC

{00184410 1 }

39

a.  by incorporating the licensed Keratin Know-How and confidential elements from within the Keratin Library into illegitimate and inaccurate patent applications and information disclosures and filed with the US Patent and Trademark Office;

b.  by incorporating them into commercial product development without disclosing the same to WFU under the Agreements or remitting to WFU compensation therefor as required by the License; and

c.  by diverting the Keratin Know-How and Keratin Library for the separate, independent commercial advantage and gain of KeraNetics and Virtue Labs, and the resulting personal and individual financial benefit and gain of Burnett, Westmoreland and Johnson, none of which they could have achieved on their own without such misappropriation.

134.    Each of KeraNetics, Virtue Labs, Burnett, Westmoreland and Johnson knew that their conversion of the Keratin Know-How and Keratin Library in the manner and for the purposes described above was not in compliance with the Agreements that allowed access to and governed their use of the Keratin Know-How and Keratin Library.

135.    Burnett, Westmoreland and Johnson had independent and personal knowledge of the same as actors intimately, directly and personally involved in negotiating, executing and effectuating the Agreements with WFU, and through direct and personal participation in the relationship between WFU and KeraNetics created by the same.  Their direct knowledge of the same is imputed directly to both KeraNetics and Virtue Labs to the extent that they acted for or on behalf of either or both.

THE CREEKMORE
LAW FIRM PC

136.     Each of KeraNetics, Virtue Labs, Burnett, Westmoreland and Johnson knew or should have known such conversion of the Keratin Know-How and Keratin Library would cause Dr. Van Dyke injury, including to his ongoing keratin research at Virginia Tech and his financial wherewithal in Montgomery County.

137.     Each of WFU, KeraNetics, Virtue Labs, Burnett, Westmoreland and Johnson have acted with willful, purposeful and malicious intent, or, at a minimum, with reckless and deliberate disregard for Dr. Van Dyke's rights, in committing these acts.

138.     Dr. Van Dyke has been significantly, proximately and directly damaged by this conversion and the resulting degradation in value of the Keratin Know-How and the Keratin Library, which damage is continuing and worsening as KeraNetics and Virtue Labs continue to make unlawful use of the Keratin Know-How and Keratin Library.

**COUNT VI**
**Unjust Enrichment Against KeraNetics and Virtue Labs**

139.     Paragraphs 1 through 98 are incorporated by reference as if fully restated herein.

140.     The Keratin Know-How and Keratin Library constitute a valuable property right of Dr. Van Dyke. They have been developed by Dr. Van Dyke over many years of carefully guarded scientific research and development; they are not generally known to, or readily ascertainable by proper means by others in the field who would be able to derive economic value from their disclosure and use; they have great financial value in and of themselves by affording to anyone in their possession a significant competitive advantage in the marketplace of keratin-based research, development and product commercialization; and they have been closely guarded by Dr. Van Dyke since development and have only been shared or divulged to WFU and KeraNetics under the protection of Dr. Van Dyke's employment agreements with

THE CREEKMORE
LAW FIRM PC

WFU and the Agreements between WFU and KeraNetics, which explicitly govern their proper and possible uses by KeraNetics.

141.    Each of KeraNetics and Virtue Labs have benefited from their misappropriation and conversion of the Keratin Know-How and Keratin Library to their own uses without having to develop the same independently, thereby saving themselves a decade or more of research and development time and costs, and gaining for themselves a competitive advantage that they otherwise would not be able to enjoy by immediately developing and launching products into the marketplace and receiving the financial benefits therefrom.

142.    Each of KeraNetics and Virtue Labs have benefited from their misappropriation and conversion of the Keratin Know-How and Keratin Library by incorporating them into illegitimate and inaccurate patent applications and information disclosures and filed with the US Patent and Trademark Office; by incorporating them into commercial product development; and by diverting the Keratin Know-How and Keratin Library for the separate, independent commercial advantage and gain of KeraNetics and Virtue Labs, all without any compensation to WFU or Dr. Van Dyke therefor.

143.    Each of KeraNetics and Virtue Labs knew that their conversion of the Keratin Know-How and Keratin Library in the manner and for the purposes described above was not in compliance with the Agreements that required appropriate compensation in the form of Milestone Payments and royalties for the same.

144.    Burnett, Westmoreland and Johnson had independent and personal knowledge of the same as actors intimately, directly and personally involved in negotiating, executing and effectuating the Agreements with WFU, and through direct and personal participation in the relationship between WFU and KeraNetics created by the same.  Their direct knowledge of the

THE CREEKMORE
LAW FIRM PC

same is imputed directly to both KeraNetics and Virtue Labs to the extent that they acted for or on behalf of either or both.

145.    Each of KeraNetics and Virtue Labs knew or should have known that their misappropriation and conversion of the Keratin Know-How and Keratin Library would cause Dr. Van Dyke injury, including in Montgomery County where he resides and works, which is continuing, and would inure to their own corresponding unjustified benefit, which is continuing to be realized.

146.    Each of KeraNetics and Virtue Labs have unjustifiably retained all the benefits of their misappropriation and conversion of the Keratin Know-How and Keratin Library without having remitted any compensation to WFU and Dr. Van Dyke that was due and owing in exchange for the same, which he should have received in Montgomery County.

### COUNT VII
### Statutory Business Conspiracy by KeraNetics,
### Virtue Labs, Burnett, Westmoreland and Johnson
### In Violation of Virginia Code § 18.2-499 et seq.

147.    Paragraphs 1 through 98 are incorporated by reference as if fully restated herein.

148.    Each of KeraNetics and Virtue Labs, working jointly with and aided and abetted directly by Burnett, Westmoreland and Johnson, all of whom had independent, direct and personal knowledge of the impropriety of their conduct, have combined and conspired to collectively, knowingly and unlawfully, with the preconceived and premeditated purposes of

a.  circumventing KeraNetics and Virtue Labs' financial obligations under the License;

b.  interfering with, and causing breaches of, KeraNetics' faithful performance of its obligations to manage, safeguard and protect the licensed keratin resources under the Agreements;

THE CREEKMORE
LAW FIRM PC

c. causing, aiding and abetting the wrongful transfer, misappropriation, use and disclosure of the licensed Keratin Know-How and Keratin Library and trade secrets contained therein, for the separate benefit of KeraNetics, Virtue Labs, Burnett, Westmoreland and Johnson, without any compensation to WFU or Dr. Van Dyke therefor; and

d. causing, aiding and abetting KeraNetics and Virtue Labs' conversion of the Keratin Know-How and Keratin Library and trade secrets contained therein for their own self-serving and independent uses and to their own financial gain.

149. Each of KeraNetics, Virtue Labs, Burnett, Westmoreland and Johnson knew that their collectively and premeditated acquisition, use and disclosure of the Keratin Know-How and Keratin Library in the manner and for the purposes as described at length above was not in compliance with the Agreements that allowed access to and governed KeraNetics' use of the Keratin Know-How and Keratin Library.

150. Burnett, Westmoreland and Johnson had independent and personal knowledge of the same as actors intimately, directly and personally involved in negotiating, executing and effectuating the Agreements with WFU, and through direct and personal participation in the relationship between WFU and KeraNetics created by the same. Their direct knowledge of the same is imputed directly to both KeraNetics and Virtue Labs to the extent that they acted for or on behalf of either or both.

151. KeraNetics, Virtue Labs, Burnett, Westmoreland and Johnson have taken all of these actions in combination with one another, for the preconceived and intended purpose of injuring both WFU and Dr. Van Dyke, directly and indirectly, in their business, trade and

THE CREEKMORE
LAW FIRM PC

profession by causing a loss of compensation and revenue to which both WFU and Dr. Van Dyke were owed and deserved as part of the benefit of the bargain of the employment agreements between WFU and Dr. Van Dyke and as the consideration for the Agreements entered into between WFU and KeraNetics, of which Dr. Van Dyke was a known and intended third party beneficiary.

152.    KeraNetics, Virtue Labs, Burnett, Westmoreland and Johnson have taken all of these actions in combination with one another, for the preconceived and intended purpose of injuring Dr. Van Dyke as a potential competitor in the marketplace, by injuring and impairing his future research potential and his potential for commercializing the Keratin Know-How by degrading and devaluing the trade secret value of the Keratin Know-How and Keratin Library through KeraNetics and Virtue Labs' own improper and unlawful use, disclosure and commercialization of the same.

153.    Each of KeraNetics, Virtue Labs, Burnett, Westmoreland and Johnson took their collective actions and committed their collective breaches, derelictions of duties and unlawful conduct as stated above with the collective and shared intention of benefitting each other and themselves jointly and severally with blatant disregard for the known and foreseeable direct and proximately resulting financial and professional harm and detriment of Dr. Van Dyke in his professional and business endeavors that are fully dependent upon the value and integrity of the licensed keratin resources that Defendants have impaired.

154.    In so doing, KeraNetics, Virtue Labs, Burnett, Westmoreland and Johnson have acted knowingly, intentionally, willfully and maliciously to directly and proximately cause injury and damage to Dr. Van Dyke's business and professional opportunities by denying Dr.

THE CREEKMORE
LAW FIRM PC

Van Dyke the full and continuing value and benefit of his Keratin Know-How and the Keratin Library, to which he has devoted his entire professional career.

155.    The concerted actions of KeraNetics, Virtue Labs, Burnett, Westmoreland and Johnson have caused significant, direct and proximate injury to Dr. Van Dyke's ongoing research at Virginia Tech, his standing in the research community both at Virginia Tech and at large, his current and ongoing revenue potential to be derived from keratin-based product development and commercialization, as well as the future potential for his career, all of which damage is continuing and being suffered in Montgomery County.  In particular, Dr. Van Dyke has been significantly, proximately and directly damaged by Defendants' pre-conceived and collective misappropriation of his trade secrets and the resulting degradation in value of the Keratin Know-How and the Keratin Library, to Defendants' collective and individual benefit and to Dr. Van Dyke's consequent damage and injury, all of which damage and injury is continuing.

## **PRAYER FOR RELIEF**

WHEREFORE, Dr. Van Dyke requests that this Honorable Court enter judgment in favor of Dr. Van Dyke and against each of WFU, KeraNetics, Virtue Labs, Burnett, Westmoreland and Johnson, jointly and severally, and awarding Dr. Van Dyke:

(1) recovery of all compensatory damages sustained under each and every Count and claim alleged above, for all harm, damage and financial injury suffered by Dr. Van Dyke from each act and claim alleged against each Defendant, in an amount not less than $146,000,000;

(2) recovery of treble damages as allowed as against those Defendants responsible for the statutory business conspiracy alleged in Count VII;

THE CREEKMORE
LAW FIRM PC

(3) recovery of punitive damages as allowed by law in an amount not less than $350,000 against each and every Defendant shown to have acted with willful, purposeful and malicious intent, or with reckless and deliberate disregard to Dr. Van Dyke's rights, as to each of the claims alleged in on Counts IV, V and VII;

(4) recovery of his court costs and reasonable attorneys' fees, as allowed by law against each and every Defendant shown to be responsible for the misappropriation of trade secrets and statutory business conspiracy alleged in Counts IV and VII;

(5) pre-judgement and post-judgement interest as may be allowed by law on all amounts awarded above; and

(6) any and all injunctive relief required to remedy and curtail the continuing breaches and malfeasance of Defendants as alleged above, and to secure and protect the confidentiality and value of the Keratin Know-How and Keratin Library against continuing breaches of the Agreements by WFU and KeraNetics and against continuing misappropriation and conversion by KeraNetics, Virtue Labs, Burnett, Westmoreland and Johnson.

A TRIAL BY JURY ON ALL ISSUES SO TRIABLE IS REQUESTED.

Respectfully submitted,

DR. MARK E. VAN DYKE

By:     /s/ James R. Creekmore
        James R. Creekmore (VSB No. 36246)
        Attorney for Plaintiff
        The Creekmore Law Firm PC
        318 N. Main Street
        Blacksburg VA 24060
        (540) 443-9350 (voice and fax)
        james@creekmorelaw.com