IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| DR. MARK E. VAN DYKE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:21-CV-627 |
| | ) | |
| WAKE FOREST UNIVERSITY HEALTH SCIENCES; KERANETICS, INC.; VIRTUE LABS, LLC; LUKE BURNETT; KIM WESTMORELAND; and CHARLES W. JOHNSON, | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Catherine C. Eagles, District Judge.

From 2004 until 2012, the plaintiff Dr. Mark Van Dyke worked for defendant Wake Forest University as a professor. According to the operative complaint, he was an expert in the development and manufacture of keratin products when he came to Wake Forest. He assigned all his intellectual property rights in property developed during his employment to Wake Forest. In 2008, Wake Forest entered into a licensing agreement with the predecessor of defendant KeraNetics, Inc., a company in which Dr. Van Dyke had an ownership interest. When he left for Virginia Tech in 2012, Dr. Van Dyke signed a release giving up all rights against Wake Forest. After he sued KeraNetics and its officers in 2013, that lawsuit was resolved, and he signed a release in 2014.

Dr. Van Dyke asserts claims against Wake Forest, KeraNetics and three of its officers, and Virtue Labs, a company working with KeraNetics to manufacture keratin

products. Among other things, he asserts that Wake Forest has failed to enforce the license agreement against KeraNetics and that all the defendants have misappropriated his trade secrets. But he has failed to allege facts sufficient to plausibly assert third-party beneficiary status, nor has he identified any trade secrets owned only by him that any party misappropriated. The defendants' motions to dismiss will be granted.

## I. Facts As Alleged

For purposes of this order, the Court assumes the truth of the factual allegations contained in the amended complaint and draws all reasonable inferences in Dr. Van Dyke's favor. *See Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

Dr. Van Dyke is an experienced and well-known researcher in the field of keratins, the proteins that make up wool, hair, and fingernails. Doc. 52 at ¶ 12. He has been or is a professor and keratin researcher at the University of Arizona, *id.* at ¶ 2, Southwest Research Institute, *id.* at ¶ 14, Wake Forest University, *id.*, and Virginia Tech. *Id.* at ¶ 68. Over the years, he has amassed a significant library of articles, papers, and other research materials involving keratin, *id.* at ¶ 23, generated considerable work product and expertise in keratin, *id.* at ¶ 22, and developed a large-scale manufacturing system capable of producing kilograms of purified keratin material. *Id.* at ¶ 42.

When Dr. Van Dyke arrived at Wake Forest, he assigned his rights in all inventions, discoveries, and innovations to Wake Forest. *Id.* at ¶¶ 16, 20; Doc. 52-2 at 65. Wake Forest agreed to pay Dr. Van Dyke a specified share of gross proceeds arising from patented inventions and inventions marketed by the university. Doc. 52-2 at 69.

2

His employment agreement is reflected in the offer letter signed by both parties, Doc. 52-1; the Employee Handbook, Doc. 52-2; and a memo distributing royalties. Doc. 52-4.

In 2008, Dr. Van Dyke co-founded defendant KeraNetics, Inc., with Wake Forest's consent and involvement. Doc. 52 at ¶ 28. Defendant Kim Westmoreland was the CEO and defendant Charles Johnson was the Managing Director. *Id.* Defendant Luke Burnett worked at KeraNetics. *Id.* at ¶¶ 37, 43. Dr. Van Dyke was the Chief Scientific Officer and the company's largest equity holder. *Id.* at ¶ 29.

Wake Forest and KeraNetics entered into a license agreement, Doc. 52-5, whereby Wake Forest gave KeraNetics an exclusive license to all patent rights listing Dr. Van Dyke as sole inventor and a non-exclusive license to the other intellectual property rights Dr. Van Dyke had assigned to Wake Forest. Doc. 52 at ¶ 30. In the License Agreement, Wake Forest also gave KeraNetics non-exclusive access to and a copy of the library of research information compiled by Dr. Van Dyke as it existed at that time. *Id.*

As part of the License Agreement, KeraNetics agreed to pay fees to Wake Forest to fund additional research. Doc. 52-5 at 15–16. To that end, the parties entered two other contracts: a Sponsored Research Agreement whereby KeraNetics provided money to Wake Forest for research, Doc. 52 at ¶ 35, Doc. 52-7 at 2 ¶ A, and a Visiting Scientist Agreement allowing KeraNetics employees broad access to Wake Forest facilities, including Dr. Van Dyke's laboratory. Doc. 52 at ¶¶ 36–37; *see* Doc. 52-6.

KeraNetics and Dr. Van Dyke also entered into a Consulting Agreement. Doc. 52 at ¶ 39; Doc. 52-7. Beyond his work at his Wake Forest Lab, Dr. Van Dyke agreed to provide additional assistance to the company in establishing laboratories and to train

3

Case 1:21-cv-00627-CCE-JLW Document 78 Filed 11/29/21 Page 3 of 19

employees in keratin manufacturing and purification processes. Doc. 52 at ¶ 41; *see also* Doc. 52-7 at 11.

In 2012, Dr. Van Dyke left Wake Forest and set up a research lab as a professor at Virginia Tech. Doc. 52 at ¶ 68. He and KeraNetics entered into a revised Consulting Agreement to deal with Dr. Van Dyke's change in location and employment, *id.* at ¶ 69, and KeraNetics entered into a research agreement with Virginia Tech. *Id.* at ¶ 70.

In 2013, employees of KeraNetics established Virtue Labs, *id.* at ¶ 80, which is in the business of producing cosmetic products from keratin materials. *Id.* at ¶ 83. While at Wake Forest, Dr. Van Dyke trained the person who now works as its Chief Scientific Officer, *id.* at ¶ 80, and KeraNetics shared the research information it obtained from Wake Forest with Virtue Labs without Wake Forest's permission. *Id.* at ¶ 86.

That same year, Dr. Van Dyke's relationship with KeraNetics and its officers soured, *id.* at ¶¶ 71–72, and KeraNetics terminated the research agreement with Virginia Tech in June 2013. *Id.* at ¶ 72. KeraNetics sent a cease and desist letter to Dr. Van Dyke, *id.* at 73, and everyone hired lawyers. *Id.* In November 2013, Dr. Van Dyke sued KeraNetics, Mr. Burnett, Ms. Westmoreland, and Mr. Johnson in Virginia state court. *Id.* at ¶ 74. The litigation was resolved in the fall of 2014 by settlement. *Id.* at ¶ 75. As part of that settlement, Dr. Van Dyke, KeraNetics, Ms. Westmoreland, and Mr. Johnson signed a settlement agreement and mutual release. Doc. 20-3.[1] KeraNetics bought out

---

[1] Dr. Van Dyke does not refer to the release in the operative complaint, but he does specifically mention the settlement. Doc. 52 at ¶ 75. The defendants Mr. Burnett, Mr. Johnson, and Ms. Westmoreland have filed a copy of the mutual release by which the parties settled the

4

Dr. Van Dyke's shares, *id.* at ¶ 3.0, and each side released all claims, known and unknown, against the other. *Id.* at ¶¶ 6.1–6.3.

After the lawsuit was resolved, KeraNetics continued developing commercial applications of keratin. Doc. 52 at ¶¶ 77–78. It continued to use the information it acquired through its agreements with Wake Forest and through its work with Dr. Van Dyke. *Id.* at ¶¶ 77–78, 83. KeraNetics and the individual defendants formed several other companies affiliated with KeraNetics who also use this information. *Id.* at ¶ 81.

KeraNetics has made sales of keratin products. *Id.* at ¶¶ 94–95. Under the License Agreement with Wake Forest, KeraNetics owes Wake Forest money for sales and royalties, which it has never paid. *Id.* at ¶¶ 87–89. Had KeraNetics made these payments to Wake Forest, Dr. Van Dyke would be entitled to a share. *Id.* at ¶ 89.

In June 2017, KeraNetics obtained FDA approval for one of its keratin products made using information licensed to it by Wake Forest or provided by Dr. Van Dyke as part of his consulting agreement. *Id.* at ¶ 94. KeraNetics owes Wake Forest $100,000 for reaching this milestone, but it has not paid, and Wake Forest has taken no steps to collect. *Id.* KeraNetics has reached other milestones under the licensing agreement and has also failed and refused to pay Wake Forest money owed. *Id.* at ¶¶ 95–99. KeraNetics' use of affiliated companies and entities has disguised and concealed events triggering milestone and royalty payments to Wake Forest. *Id.* at ¶ 82.

---

lawsuit, Doc. 20-3, and Dr. Van Dyke has not challenged its authenticity. *See Copeland v. Bieber*, 789 F.3d 484, 490 (4th Cir. 2015) (authorizing consideration of documents not attached to the complaint when they are "integral to" the allegations and authenticity is not challenged).

In total, KeraNetics and Virtue Labs owe Wake Forest more than $1.7 million; if Wake Forest had received this money, Dr. Van Dyke would be entitled to more than $680,000. *Id.* at ¶ 99. Wake Forest has taken no steps to enforce its rights against KeraNetics. *Id.* at ¶¶ 100–01.

The Court will recite other allegations in the context of specific claims.

## II. Claims for Relief

Dr. Van Dyke brings claims against Wake Forest for breach of the employment agreement, breach of the License Agreement, breach of fiduciary duty, misappropriation of trade secrets, and unfair and deceptive trade practices.[2] He sues KeraNetics for breach of the License Agreement, misappropriation of trade secrets, unfair and deceptive trade practices, and unjust enrichment.[3] He sues Mr. Burnett, Ms. Westmoreland, and Mr. Johnson for misappropriation of trade secrets and unfair trade practices.[4] He sues Virtue Labs for misappropriation of trade secrets, unfair and deceptive trade practices, and unjust enrichment.[5] He also brings a claim under 35 U.S.C. § 256 seeking to correct the

---

[2] These claims are denominated in the operative complaint as the First, Second, Third, Fourth, and Seventh Causes of Action. Doc. 52 at 43, 45, 48, 51, 60.

[3] These claims are denominated in the operative complaint as the Second, Fourth, Sixth, Seventh, and Eighth Causes of Action. Doc. 52 at 45, 51, 57, 60–61.

[4] These claims are denominated in the operative complaint as the Fourth and Seventh Causes of Action. Doc. 52 at 51, 60.

[5] These claims are denominated in the operative complaint as the Fourth, Sixth, and Seventh Causes of Action. Doc. 52 at 51, 57, 60.

named inventors on several patents.[6] The Court will evaluate the pending motions to dismiss in the order the claims are asserted in the operative complaint.

III. Discussion

### A. Claim Against Wake Forest for Breach of Employment Agreement (Doc. 52 at pp. 43–45 ¶¶ 99–104)

Dr. Van Dyke asserts a claim for breach of contract against Wake Forest based on the employment agreement, as reflected primarily in his offer letter and the employee handbook. Specifically, he contends Wake Forest breached the agreement by failing to protect Dr. Van Dyke's "ongoing personal and pecuniary interests" in the intellectual property shared with KeraNetics; by failing to enforce the License Agreement against KeraNetics; by failing to ensure "maximum financial return to Dr. Van Dyke" or failing to collect money owed to Wake Forest under the License Agreement; and by failing to exercise reasonable care in the management of its agreements with KeraNetics, thereby allowing valuable confidential and proprietary information belonging to Dr. Van Dyke to be disclosed and transferred to others. Doc. 52 at ¶¶ 100–01.

To support his claims, Dr. Van Dyke relies on the License Agreement, *see* Doc. 67 at 19–21, but that agreement is between Wake Forest and KeraNetics. It is not part of his employment agreement with Wake Forest and in any event, it contains no promises by Wake Forest to Dr. Van Dyke.

---

[6] This claim is denominated in the operative complaint as the Fifth Cause of Action. Doc. 52 at 56.

7

His employment agreement, as alleged, requires Wake Forest to pay a certain share of money received from KeraNetics over to Dr. Van Dyke, but he does not allege a violation of this part of the agreement. He does not directly allege that Wake Forest did not own the intellectual property it licensed to KeraNetics, and indeed his allegations assume that Wake Forest had ownership rights it could assign or license to others without his specific permission. He admits he assigned to Wake Forest all interests in any of his inventions and discoveries. He points to nothing in any document reflecting his employment agreement where Wake Forest agreed to protect his purported personal and pecuniary interest in the intellectual property that he assigned to Wake Forest, to enforce the terms of its agreements with KeraNetics for Dr. Van Dyke's benefit, to ensure a maximum financial return to Dr. Van Dyke, or to exercise reasonable care in its agreements with KeraNetics. Dr. Van Dyke does not state a claim for breach of contract on which relief may be granted.

Dr. Van Dyke does assert in the briefing that Wake Forest did not own all the "intellectual property resources covered by the License," *id.* at 12, and he seems to contend this supports his claim for breach of contract. While not completely clear, Dr. Van Dyke seems to be saying that Wake Forest had a contractual duty to Dr. Van Dyke to recover royalties and other payments from KeraNetics for KeraNetics' use of Dr. Van Dyke's intellectual property that Wake Forest did not license to KeraNetics. Yet he does not allege any facts to support this contention, which borders on the nonsensical. Somewhat more sensibly, Dr. Van Dyke might be saying that Wake Forest breached its agreement with Dr. Van Dyke by disclosing confidential information it did not own to

8

KeraNetics. Assuming this is what he means, it does not help his position. It is clear from the allegations that the disclosures were made with Dr. Van Dyke's knowledge and consent while he worked at Wake Forest from 2008 through 2012, so any such claim is barred by both the three-year statute of limitations and by the release Dr. Van Dyke signed when he left Wake Forest.

### B. Claim Against Wake Forest and KeraNetics for Breach of the License Agreement (Doc. 52 at ¶¶ 105–114)

Dr. Van Dyke contends that Wake Forest has breached the License Agreement by failing to provide agreed-upon benefits to Dr. Van Dyke and that Wake Forest and KeraNetics breached promises to manage and safeguard the intellectual property that Dr. Van Dyke provided and that belongs to Wake Forest. *Id.* at ¶¶ 106–10. But Dr. Van Dyke is not a party to the License Agreement. The License Agreement is between Wake Forest and KeraNetics, who made promises to each other, and it does not contain any promises or obligations to Dr. Van Dyke. Dr. Van Dyke cannot sue for breach of a contract to which he is not a party and that does not directly benefit him.

Dr. Van Dyke contends that he is a third-party beneficiary of the License Agreement. "[T]he determining factor as to the rights of a third-party beneficiary is the intention of the parties who actually made the contract. The real test is said to be whether the contracting parties intended that a third party should receive a benefit which might be enforced in the courts." *Snyder v. Freeman,* 300 N.C. 204, 220, 266 S.E.2d 593, 604 (1980) (cleaned up). "[I]ntent to benefit is the determining factor." *Raritan River Steel Co. v. Cherry, Bekaert & Holland*, 329 N.C. 646, 652, 407 S.E.2d 178, 182 (1991).

9

Here, the facts as alleged do not plausibly support the third-party beneficiary contention and indeed show otherwise. Wake Forest and KeraNetics explicitly agreed that none of the promises in the agreement should be construed as conferring any rights on any third party. Doc. 52-5 at 33 ¶ 17.6. The License required KeraNetics to pay all of the money over to Wake Forest, and the License did not mention any contractual duties between Wake Forest and Dr. Van Dyke. Nothing in the License Agreement required that royalties be paid to Dr. Van Dyke. *See Kucharczyk v. Regents of Univ. of Cal.*, 946 F. Supp. 1419, 1432 (N.D. Cal. 1996) (dismissing breach of contract claim where plaintiff was not a party to a license agreement and the license agreement did not call for payment of royalties to plaintiff). There are no facts alleged that might plausibly indicate Wake Forest entered into the License Agreement to satisfy a duty it had to Dr. Van Dyke. *See Vogel v. Reed Supply Co.*, 277 N.C. 119, 127, 177 S.E.2d 273, 278 (1970) (noting that duties owed to creditor beneficiaries are enforceable by them). He has failed to state a claim for breach of the License Agreement.

To the extent Dr. Van Dyke asserts that KeraNetics has breached the Sponsored Research Agreement or the Visiting Scientist Agreement, the same result obtains. Those are contracts between KeraNetics and Wake Forest, and the duties and obligations flow between those parties. None of those contracts show any intent to directly provide a financial benefit to Dr. Van Dyke.

Dr. Van Dyke points to the "larger factual context within which the License Agreement was entered," Doc. 67 at 22, including the expertise he brought to the table, the financial rewards he expected to receive through Wake Forest, and his involvement in

10

founding KeraNetics. The facts as alleged support a claim that Wake Forest and KeraNetics expected the License would benefit Dr Van Dyke, but those facts also make it clear that the benefit was incidental—he derived his benefits from the License Agreement indirectly, as KeraNetics fulfilled its duties to Wake Forest. *See Vogel*, 277 N.C. at 129 (holding that plaintiff landowner was not a third-party beneficiary where "performance of the subcontract was rendered in fulfillment of [the subcontractor's] obligation to the general contractor" and "any benefit derived from the subcontract by the landowner would necessarily accrue indirectly, i.e., through the general contractor"). The "larger context" does not give rise to a plausible inference that two sophisticated parties intended to impose on themselves an unwritten obligation to a third party when entering into a series of written contracts with each other and that third party.

Dr. Van Dyke also asserts in the briefing that Wake Forest did not own all of the "intellectual property resources covered by the License," Doc. 67 at 12, and seems to say this supports his claim for breach of the License Agreement. But if Wake Forest did not own those resources, it is difficult to understand how Wake Forest could enforce any payment obligation on KeraNetics or why KeraNetics has breached the agreement by not paying Wake Forest for use of property that Wake Forest did not own or license.

### C. Claim Against Wake Forest for Breach of Fiduciary Duty (Doc. 52 at ¶¶ 115–119)

Dr. Van Dyke claims that Wake Forest had a fiduciary duty to him to maximize and collect royalties under the License Agreement. But the facts do not support a

11

plausible inference that Wake Forest had a fiduciary duty to Dr. Van Dyke that would require it to place his interests above its own.

For there to be a fiduciary duty, there must be a fiduciary relationship where "there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence, and it extends to any possible case in which there is confidence reposed on one side and resulting domination and influence on the other." *Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707–08 (2001) (cleaned up). "Common to all [fiduciary] relationships is a heightened level of trust and the duty of the fiduciary to act in the best interests of the other party." *Dallaire v. Bank of Am., N.A.*, 367 N.C. 363, 367, 760 S.E.2d 263, 266 (2014).

North Carolina courts have generally refused to recognize a fiduciary relationship between an employer and employee. *See, e.g.*, *Dalton*, 353 N.C. at 651. The North Carolina Supreme Court refused to recognize such a relationship between a university and a professor in *Speck v. North Carolina Dairy Foundation, Inc.*, 311 N.C. 679, 688, 319 S.E.2d 139, 145 (1984), noting among other things that universities "are not dedicated to making and retaining profits, but instead use their income for the good of the public by promoting and financially assisting scientific research for the common good." *Id.* There are clear "divided loyalties" in the academic setting inconsistent with any requirement that the university put the needs of one professor above all other duties and interests. *See generally McCants v. Nat'l Collegiate Athletic Ass'n*, 201 F. Supp. 3d 732, 748 (M.D.N.C. 2016). The Wake Forest patent policy recognizes many goals, including

12

encouraging research, serving the public interest, and protecting the interests of the university. Doc. 52-2 at 65 ¶ 1.

While existence or nonexistence of a fiduciary relationship depends on the circumstances presented in each case and is generally a determination for the finder of fact, *McCants*, 201 F. Supp. 3d at 747, the mere invocation of the words "fiduciary relationship" does not mean a case automatically moves to discovery. Here, Dr. Van Dyke has not alleged facts sufficient to support a plausible inference that Wake Forest owed him a fiduciary duty. This claim will be dismissed.

### D. Claim Against All Defendants for Misappropriation of Trade Secrets (Doc. 52 at ¶¶ 120–131)

To the extent this claim is against Wake Forest, it fails to state a claim. As previously discussed, all of the alleged trade secrets belonged to Wake Forest because Dr. Van Dyke had assigned them to Wake Forest. He does not specifically allege that he owned other or different trade secrets that he did not assign to Wake Forest that the university has somehow misappropriated. While he seems to claim that he jointly owned these trade secrets with Wake Forest, he does not allege that his assignment of any trade secrets was conditional or limited, nor does he allege any facts tending to indicate that Wake Forest did not have the legal ability to transfer or disclose any such information to others. Dr. Van Dyke does not explain in his briefing how Wake Forest could misappropriate trade secrets that it owned.

There are similar related problems as to the misappropriation claim against the other defendants. As noted, Dr. Van Dyke alleges that KeraNetics came into possession

13

of the trade secrets lawfully, by agreement with Wake Forest, *see e.g.*, Doc. 52 at ¶¶ 19–20, who as previously discussed had the right to license use of that intellectual property to KeraNetics. If KeraNetics and its officers and employees thereafter misappropriated those trade secrets by disclosing them to Virtue Labs, and if Virtue Labs misappropriated them by using those trade secrets disclosed by KeraNetics, it is Wake Forest's rights that have been violated, not Dr. Van Dyke's. Even assuming Dr. Van Dyke also maintained an ownership interest in the purported trade secrets, as he contends in his briefing, Doc. 65 at 22, he nowhere alleges that he had a right to veto Wake Forest's decisions about what it did with its property rights in those trade secrets. Indeed, it is nonsensical to claim that he can transfer his property rights while at the same time retaining the same property rights; if that were so, Wake Forest's rights would be meaningless.

While Dr. Van Dyke may be asserting that there are trade secrets at issue that only he owns, he has not specifically identified any such trade secret that belonged only to him. At the pleading stage, a plaintiff asserting a claim under North Carolina law for trade secret misappropriation "must identify a trade secret with sufficient particularity so as to enable a defendant to delineate that which he is accused of misappropriating[.]" *Krawiec v. Manly*, 370 N.C. 602, 609, 811 S.E.2d 542, 547 (2018) (cleaned up). "General allegations" that do not specifically identify the trade secrets allegedly misappropriated are "insufficient to state a claim for misappropriation of trade secrets." *Id.* at 610. Yet Dr. Van Dyke's allegations are general, identifying only categories without specificity and without differentiating what he purportedly owns as opposed to what he licensed to Wake Forest.

14

Even if he had identified those trade secrets, he has not alleged any facts tending to show that he took precautions to protect the secrecy of that information in his own dealings with KeraNetics. Indeed, the Consulting Agreement between Dr. Van Dyke and KeraNetics, recognizes only that Dr. Van Dyke had "background expertise," Doc. 52-7 at ¶ 5, and provided protections only for KeraNetics' confidential information. It does not impose any duty of confidentiality on KeraNetics or its employees as to information provided by Dr. Van Dyke, and it does not otherwise acknowledge or recognize that Dr. Van Dyke would bring any confidential information to the table. *Id.*

Finally, to the extent Dr. Van Dyke contends in briefing that Wake Forest somehow had access to and misappropriated trade secrets owned only by Dr. Van Dyke, the claim is barred by the statute of limitations and by the release he signed when he left Wake Forest in 2012. There are no facts alleged to indicate Wake Forest had any ongoing research relationship with or disclosed information to KeraNetics after Dr. Van Dyke moved to Virginia Tech. There are similar statute of limitations problems with the trade secrets claim against most of the other defendants.

While a plaintiff does not have to prove his case in the complaint, he does have to include enough specific factual allegations to make his claim for relief plausible. Dr. Van Dyke has not met this standard as to his misappropriation of trade secrets cause of action.

### E. Claim To Correct the Named Inventor Pursuant to 35 U.S.C. § 256 (Doc. 52 at ¶¶ 53–58, 132–136)

Dr. Van Dyke alleges that he should have been listed on numerous keratin-related patents as an inventor. Doc 52 at ¶¶ 53, 134. He alleges that KeraNetics filed all of these

15

patent applications based on information he provided, *id.* at ¶ 53, but he identifies with specificity only elements of Claim 1 of the '095 patent as his contribution to the invention. *Id.* at ¶ 58 (referencing '095 patent at Doc. 52-9). As to the other five patents, his conclusory allegations are insufficient to state a plausible claim.[7]

There is also another, more fundamental flaw. The statute requires as a jurisdictional prerequisite that a person claiming to be an inventor must give notice to other interested parties. There is no subject matter jurisdiction if the contending inventor does not give the required notice. *See MCV, Inc. v. King-Seeley Thermos Co.*, 870 F.2d 1568, 1570 (Fed. Cir. 1989). It is undisputed that Dr. Van Dyke has not named as defendants all of the inventors listed in the patents, and he does not allege that he has given the required notice. These claims are subject to dismissal. *See Fina Oil & Chem. Co. v. Ewen*, 123 F.3d 1466, 1471 (Fed. Cir. 1997).

Dr. Van Dyke asserted over six weeks ago that he "is in the process" of curing this deficiency with a supplemental pleading. Doc. 65 at 24. However, he has not filed the promised motion for leave to file a supplemental pleading and the record does not show that this jurisdictional deficiency has been corrected. These claims will be dismissed.

---

[7] "In order to prevail on a § 256 claim, an alleged co-inventor must show that he contributed to the conception of the claimed invention and that his contribution was 'not insignificant in quality, when that contribution is measured against the dimension of the full invention.'" *Ruling Meng v. Ching–Wu Paul Chu*, 643 F. App'x. 990, 994 (Fed. Cir. 2016). Thus, to survive a motion to dismiss, the claimant must allege facts that would allow the court to draw a reasonable inference that the claimant contributed to the conception of the claimed inventions. *See Beco Dairy Automation, Inc. v. Glob. Tech Sys., Inc.*, No. 1:12–CV–01310 LJO, 2015 WL 925588, at *5 (E.D. Cal. Mar. 3, 2015).

16

### F. Claim Against KeraNetics and Virtue Labs for Unjust Enrichment (Doc. 52 at ¶¶ 140–147)

Dr. Van Dyke claims that KeraNetics and Virtue Labs have been unjustly enriched by making use of the keratin-related intellectual property to which they obtained access through agreements with Wake Forest. As is obvious from this description, it fails for the same reason that his breach of contract claims based on these agreements failed.

As discussed *supra*, Dr. Van Dyke admits that he transferred his rights in the property to Wake Forest, that KeraNetics obtained access to the information lawfully, via agreements with Wake Forest, and that Virtue Labs obtained the information from KeraNetics. Dr. Van Dyke does not explain how he can both transfer his interests in the intellectual property to Wake Forest while at the same time retaining common law equitable rights to sue persons or entities who obtain access to the information through agreements with Wake Forest. Dr. Van Dyke has not identified any information belonging solely to him that he provided to KeraNetics or to Virtue Labs and that otherwise meets the requirements for an unjust enrichment claim. *See Butler v. Butler*, 239 N.C. App. 1, 7, 768 S.E.2d 332, 336 (2015) (listing unjust enrichment elements). This claim will be dismissed.

### G. Claim Against All Defendants for Unfair and Deceptive Trade Practices (Doc. 52 at ¶¶ 148–155)

This claim is based on the misappropriation of trade secrets claim. *See* Doc. 52 at ¶ 149; *see* Doc. 65 at 27 (plaintiff's brief asserting Claim Seven is based on trade secret misappropriation). It fails for the same reason as the misappropriation claim. *See* discussion *supra*.

### H. Claim Against KeraNetics for Unfair and Deceptive Trade Practices Based on Tortious Interference with Contract (Doc. 52 at ¶¶ 156–165)

In the alternative to his breach of contract claim against KeraNetics, Dr. Van Dyke asserts that KeraNetics has committed unfair trade practices by interfering in his contractual relationship with Wake Forest. Doc. 65 at 27–29. While a tortious interference with contract may constitute an unfair or deceptive trade practice, *see, e.g.*, *Intercollegiate Women's Lacrosse Coaches Ass'n v. Corrigan Sports Enters.*, No. 1:20-CV-00425, 2021 WL 2723381, at *9 (M.D.N.C. July 1, 2021) (collecting cases), Dr. Van Dyke's claim fails because, as previously explained, he has not plausibly alleged the necessary breach of contract by Wake Forest.

As applied here, the elements of tortious interference with contract are that Dr. Van Dyke had a valid contract with Wake Forest that confers contractual rights on Dr. Van Dyke against Wake Forest and that KeraNetics knew of the contract and intentionally and without justification induced Wake Forest not to perform the contract, resulting in actual damage to Dr. Van Dyke. *See Embree Const. Grp. v. Rafcor, Inc.*, 330 N.C. 487, 498, 411 S.E.2d 916, 924 (1992). Thus, for there to be a claim, Wake Forest must have "not performed the contract" with Dr. Van Dyke. *See, e.g.*, *United Lab'ys, Inc. v. Kuykendall,* 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988); *Griffith v. Glen Wood Co.*, 184 N.C. App. 206, 212–13, 646 S.E.2d 550, 555–56 (2007). As explained *supra*, Dr. Van Dyke has not plausibly alleged a breach of contract by Wake Forest.

Dr. Van Dyke contends that KeraNetics has interfered with his right to payment under his employment agreement with Wake Forest by refusing to pay Wake Forest

18

Case 1:21-cv-00627-CCE-JLW Document 78 Filed 11/29/21 Page 18 of 19

various milestone payments under the License Agreement. Doc. 76 at 2–3. But this has not caused a breach of contract by Wake Forest, as Wake Forest only has to pay Dr. Van Dyke when it receives payments from KeraNetics. Dr. Van Dyke also alleges that KeraNetics tortiously interfered by impeding Wake Forest's ability to determine whether KeraNetics should be making payments to Wake Forest. *Id.* at 2. But he does not cite any case that authorizes or even to tends to tangentially support authorizing this cause of action to proceed based on this "hide the ball" theory.

It is **ORDERED** that:

1. The defendant Virtue Labs' motion to dismiss the second amended complaint, Doc. 53, is **GRANTED**;

2. The defendant Keranetics, Inc.'s motion to dismiss the second amended complaint, Doc. 55, is **GRANTED**;

3. The defendants Luke Burnett, Charles W. "Todd" Johnson and Kim Westmoreland's motion to dismiss the second amended complaint, Doc. 57, is **GRANTED**; and

4. The defendant Wake Forest University Health Sciences' motion to dismiss the second amended complaint, Doc. 59, is **GRANTED**.

5. Judgment will be entered separately as time permits.

This the 29th day of November, 2021.

_____
UNITED STATES DISTRICT JUDGE

19

Case 1:21-cv-00627-CCE-JLW Document 78 Filed 11/29/21 Page 19 of 19